Case No. 22-20603

_____

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

IN RE ENTRUST ENERGY, INCORPORATED, ET AL.,
*Debtor,*

ANNA PHILLIPS, AS TRUSTEE OF THE ENTRUST LIQUIDATING TRUST,
*Respondent/Cross-Petitioner,*

v.

ELECTRIC RELIABILITY COUNCIL OF TEXAS, INCORPORATED,
*Petitioner/Cross-Respondent.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
USDC NO. 4:22-AP-3018

_____

## BRIEF OF CALPINE CORPORATION AS *AMICUS CURIAE* IN SUPPORT OF PETITIONER/CROSS-RESPONDENT

_____

George H. Fibbe
Aaron M. Streett
J. Mark Little
910 Louisiana Street
Houston, Texas 77002
Telephone: (713) 229-1234
george.fibbe@bakerbotts.com
aaron.streett@bakerbotts.com
mark.little@bakerbotts.com

*Counsel for Amicus Curiae Calpine
Corporation*

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

IN RE ENTRUST ENERGY, INCORPORATED, ET AL.,
*Debtor,*

ANNA PHILLIPS, AS TRUSTEE OF THE ENTRUST LIQUIDATING TRUST,
*Respondent/Cross-Petitioner,*

v.

ELECTRIC RELIABILITY COUNCIL OF TEXAS, INCORPORATED,
*Petitioner/Cross-Respondent.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
USDC NO. 4:22-AP-3018

**CERTIFICATE OF INTERESTED PERSONS**

Appellant Calpine Corporation ("Calpine") is a privately held corporation, and no publicly held corporation owns 10% or more of its stock. Calpine is a wholly owned subsidiary of CPN Management. The equity interests of CPN Management are owned by: (1) Volt Parent, LP ("Volt Parent"), as limited partner; and (2) Volt Parent GP, LLC ("Volt Parent GP"), as general partner. The equity interests of Volt Parent are owned by: (1) Volt Parent GP, as general partner; (2) AI Holdings (BVI) L.P., as limited partner; (3) CPPIB Calpine Canada Inc., as limited partner; (3)

various limited partners controlled by ECP ControlCo LLC ("ECP") and (4) various passive limited partners. Volt Parent GP is a wholly owned subsidiary of Energy Capital Partners III, LLC, which is, in turn, a wholly owned subsidiary of ECP.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Appellant/Cross-Appellee:** Electric Reliability Council of Texas, Inc.

> Jamil N. Alibhai
> Kevin M. Lippman
> MUNSCH HARDT KOPF & HARR, P.C.
> 3800 Ross Tower
> 500 N. Akard Street
> Dallas, Texas 75201-6659

> Wallace B. Jefferson
> Nicholas Bacarisse
> ALEXANDER DUBOSE & JEFFERSON LLP
> 515 Congress Avenue, Suite 2350
> Austin, Texas 78701

**Appellee/Cross-Appellant:** Anna Phillips, as Liquidating Trustee of the Entrust Liquidating Trust

> Charles R. Gibbs
> Debbie E. Green
> MCDERMOTT WILL & EMERY LLP
> 2501 North Harwood Street
> Dallas, Texas 75201

> Darren Azman
> Guyon Knight

McDermott Will & Emery LLP
One Vanderbilt Avenue
New York, New York 10017

**Interested Party:** Public Utility Commission of Texas

Ken Paxton
Attorney General of Texas
Brent Webster
First Assistant Attorney General

Grant Dorfman
Deputy First Assistant Attorney General
Shawn E. Cowles
Deputy Attorney General for Civil Litigation

Sean O'Neill
Assistant Attorney General
Deputy Chief, Bankruptcy & Collections Division

Layla D. Milligan
Autumn Highsmith

Office of the Attorney General of Texas Bankruptcy & Collections Division
P. O. Box 12548 MC008
Austin, Texas 78711-2548

**Interested Party:** Calpine Corporation

George Fibbe
Aaron M. Streett
J. Mark Little
Baker Botts LLP
910 Louisiana Street
Houston, TX 77002

/s/ Aaron M. Streett
Aaron M. Streett
*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

Table of Contents ...................................................... iv

Table of Authorities ...................................................... v

Interest of *Amicus Curiae* ...................................................... 1

Introduction ...................................................... 2

Argument ...................................................... 3

I.  The filed rate doctrine bars challenges against an entity's regulated rates. ...................................................... 3

II.  Because ERCOT's prices are filed rates, the filed rate doctrine bars the Trustee's challenge here. ...................................................... 5

    A.  As this Court has already held, ERCOT's prices constitute filed rates that are protected by the filed rate doctrine. ...................................................... 5

    B.  The Trustee's claims impermissibly challenge ERCOT's filed rates. ...................................................... 10

III.  This Court's recent decision in *ERCOT, Inc. v. Just Energy Texas, L.P.* further supports application of the filed rate doctrine here. ...................................................... 15

Conclusion ...................................................... 17

Certificate of Service ...................................................... 19

Certificate of Compliance with Rule 32(a) ...................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ark. La. Gas Co. v. Hall*,
453 U.S. 571 (1981) ..................................................................3, 4, 5

*Burford v. Sun Oil Co.*,
319 U.S. 315 (1943) ....................................................................2, 14

*CenterPoint Energy Entex v. R.R. Comm'n of Tex.*,
208 S.W.3d 608 (Tex. App.—Austin 2006, pet. dism'd) .................7, 8

*E. & J. Gallo Winery v. EnCana Corp.*,
503 F.3d 1027 (9th Cir. 2007) .....................................................6, 14

*ERCOT, Inc. v. Just Energy Tex., L.P.*,
57 F.4th 241 (5th Cir. 2023) ...........................................2, 14, 15, 16

*In re Enron*,
328 B.R. 75 (S.D.N.Y. 2005) ...............................................................4

*Keogh v. Chicago & Nw. Ry., Co.*,
260 U.S. 156 (1922) ....................................................................3, 15

*Marcus v. AT & T Corp.*,
138 F.3d 46 (2nd Cir. 1998) ................................................................4

*Miss. Power & Light Co. v. Miss. ex rel. Moore*,
487 U.S. 354 (1988) ............................................................................5

*Pub. Util. Dist. No. 1 v. IDACORP Inc.*,
379 F.3d 641 (9th Cir. 2004) ......................................................13, 14

*Rothstein v. Balboa Ins. Co.*,
794 F.3d 256 (2d Cir. 2015) .......................................................5, 15

*S. Branch LLC v. Commonwealth Edison Co.*,
46 F.4th 646 (7th Cir. 2022) ................................................................3

*Simon v. KeySpan Corp.*,
694 F.3d 196 (2nd Cir. 2012) ..............................................................6

*Tex. Com. Energy v. TXU Energy, Inc.*,
2004 WL 1777597 (S.D. Tex. June 24, 2004)................................4, 7, 10, 13, 15

*Tex. Com. Energy v. TXU Energy, Inc.*,
413 F.3d 507 (5th Cir. 2005) ............................................ 3, 4, 5, 6, 8, 10, 12, 14

*Util. Choice, L.P. v. TXU Corp.*,
2005 WL 3307524 (S.D. Tex. 2005) ...................................................................6

*Wegoland, Ltd. v. NYNEX Corp.*,
27 F.3d 17 (2d Cir. 1994) ...................................................................................5

*Winn v. Alamo Title Ins. Co.*,
2009 WL 7099484 (W.D. Tex. May 13, 2009) ...................................................3

**STATUTES**

TEX. UTIL. CODE § 35.004(f) .................................................................................7

TEX. UTIL. CODE § 39.101(a)(1) ...........................................................................7

TEX. UTIL. CODE § 39.151 .....................................................................................7

**OTHER AUTHORITIES**

16 TEX. ADMIN. CODE § 25.1(a)...........................................................................7

16 TEX. ADMIN. CODE § 25.501(a) .......................................................................7

**INTEREST OF *AMICUS CURIAE***

This brief is filed by Calpine Corporation ("Calpine") as *amicus curiae*[1] in support of Petitioner/Cross-Respondent the Electric Reliability Council of Texas, Inc. ("ERCOT") to present an additional market-participant perspective to assist the Court in this appeal. Calpine is one of the nation's largest generators of electricity from natural gas and geothermal resources, with robust commercial, industrial, and residential retail operations in key competitive power markets. It is based in Houston and has extensive operations in Texas and the ERCOT wholesale electricity market.

As a substantial participant in the ERCOT market, Calpine is directly impacted by, and has an interest in safeguarding the integrity of, the prices set in that market. If the Trustee were to prevail, there is a risk that ERCOT could attempt to recover short-paid amounts by surcharging Calpine and other market participants through its default uplift procedures. *See* ERCOT Protocols § 9.19(1)(e).[2] Calpine seeks to ensure that any challenges to prices set in the ERCOT market are resolved in an orderly and uniform fashion through the specified channels of state administrative review to which all market participants are bound. The alternative the Trustee advocates for—a chaotic morass of lawsuits involving various causes of

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from Calpine or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

[2] The ERCOT Nodal Protocols may be accessed at https://www.ercot.com/mktrules/nprotocols/current.

action in state and federal courts scattered throughout the state—would undermine Texas's carefully calibrated regulatory regime and threaten conflicting rulings regarding the same ERCOT prices. Calpine believes that the filed rate doctrine provides a straightforward legal basis for achieving the former and avoiding the latter.

## INTRODUCTION

The circumstances in this case are nearly identical to those in *Just Energy Texas, L.P.*, 57 F.4th 241 (5th Cir. 2023). As in *Just Energy*, the bankruptcy court here is required to abstain under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). Because *Burford* abstention is thoroughly addressed in ERCOT's brief, *see* ERCOT's Br. 22-35, those arguments are not repeated at length here.

Instead, this brief addresses the equally compelling problems the Trustee's claims create under the filed rate doctrine. Although the *Just Energy* Court did not reach this issue, the filed rate doctrine provides an additional basis requiring this Court to reverse the bankruptcy court's order. Indeed, the *Just Energy* Court's deference to Texas's administrative and judicial review process for challenging ERCOT's prices is central to the filed rate doctrine as well as abstention. Counts I, II, III, IV, and VI of the Amended Complaint are improper collateral attacks on ERCOT's filed rates, and accordingly, should have all been dismissed.

I. **The filed rate doctrine bars challenges against an entity's regulated rates.**

"The filed rate doctrine bars judicial recourse against a regulated entity based upon allegations that the entity's 'filed rate' is too high, unfair or unlawful." *Tex. Com. Energy v. TXU Energy, Inc.*, 413 F.3d 503, 507 (5th Cir. 2005). "The Supreme Court established this doctrine in *Keogh v. Chicago & Northwestern Railway, Co.*, 260 U.S. 156 (1922)," where it "held that a shipper could not bring an antitrust action against carriers in connection with tariffs paid because those tariffs had been filed and approved by the Interstate Commerce Commission." *Id.* "[T]he Court held that it was up to the respective governmental agency to determine whether the rates were discriminatory or unlawful, not the courts." *Id.* at 507-08.

"Since *Keogh,* courts have consistently applied the filed rate doctrine in a number of energy cases to preclude lawsuits against companies based on rates that were filed with a government agency." *Id.* at 508. And it "has been extended across the spectrum of regulated utilities." *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981); *see Winn v. Alamo Title Ins. Co.*, 2009 WL 7099484, at *3 (W.D. Tex. May 13, 2009) (collecting cases dismissing claims based on the filed rate doctrine). Importantly, "[c]ourts have uniformly held . . . that the rationales underlying the filed rate doctrine apply equally strongly to regulation by state agencies." *TCE*, 413 F.3d at 509; *see also S. Branch LLC v. Commonwealth Edison Co.*, 46 F.4th 646,

650 (7th Cir. 2022) (collecting cases and stating that "circuit courts, including our own, have uniformly held [the filed rate doctrine] applies when rates are filed with state regulators"). Its reach extends to proceedings in bankruptcy courts as well. *See, e.g.*, *In re Enron*, 328 B.R. 75, 78, 85-86 (S.D.N.Y. 2005) ("filed rate doctrine bars" claimant's antitrust claims based in allegations that the debtor "overcharged" for "wholesale electricity").

"Simply stated, the [filed rate] doctrine holds that any 'filed rate'—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers." *TCE*, 413 F.3d at 508. This broad and longstanding principle completely "bars judicial recourse . . . based upon allegations that the entity's 'filed rate' is too high, unfair, or unlawful." *Id.* at 507. The doctrine applies regardless of "the culpability of the defendant's conduct" and "the possibility of inequitable results." *Tex. Com. Energy v. TXU Energy, Inc.*, 2004 WL 1777597, at *7 (S.D. Tex. June 24, 2004) (quoting *Marcus v. AT & T Corp.*, 138 F.3d 46, 58 (2nd Cir. 1998)), *aff'd*, 413 F.3d 503 (5th Cir. 2005).

The filed rate doctrine ensures that challenges to rates are directed in an organized manner into the appropriate forum. To be sure, filed rates may be challenged before the regulatory agency and then through the prescribed judicial-review process for those regulatory determinations. *Ark. La. Gas Co.*, 453 U.S. at 577-78. But collateral attacks on rates through claims in state or federal court are

4

prohibited. *Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 375 (1988). By channeling rate challenges in that way, the filed rate doctrine both "preserv[es] . . . the agency's primary jurisdiction over reasonableness of rates," *Ark. La. Gas Co.*, 453 U.S. at 577-78, and upholds the "nondiscrimination principle" by ensuring that "victorious plaintiffs [do not] wind up paying less than non-suing ratepayers." *Rothstein v. Balboa Ins. Co.*, 794 F.3d 256, 265 (2d Cir. 2015).

II.     **Because ERCOT's prices are filed rates, the filed rate doctrine bars the Trustee's challenge here.**

This Court held in *TCE* that prices charged in the ERCOT wholesale energy market constitute filed rates that are protected by the filed rate doctrine. 413 F.3d at 509-10. As such, those prices are "per se reasonable and unassailable in judicial proceedings," and there can be no "judicial recourse . . . based upon allegations that the[y] . . . [are] too high, unfair, or unlawful." *Id.* at 507-08 (quoting *Wegoland, Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994)). The Trustee does precisely what the filed rate doctrine prohibits by challenging as unlawful the $9,000/MWh filed rate at issue in this case.

A.      **As this Court has already held, ERCOT's prices constitute filed rates that are protected by the filed rate doctrine.**

The $9,000/MWh wholesale energy price charged to Entrust and every other ERCOT market participant during the Winter Storm constitutes a filed rate.

This Court has already held as much in *TCE*.  The debtor-plaintiff in *TCE* asserted that the filed rate doctrine did not apply to ERCOT rates in the "Balancing Energy Service" ("BES," *i.e.*, spot) market—"a bid-based wholesale market for short-term electricity power"—because (1) the Public Utility Regulatory Act ("PURA") did "not require rates in the BES market to be filed with PUCT [the Public Utility Commission of Texas]" and (2) the PUCT did "not set or approve these rates."  *TCE*, 413 F.3d at 506, 509.  This Court rejected those arguments and held that "market-based energy rates" are considered filed rates if they are subject to regulatory oversight and review.  *Id.*  Because PURA vests the PUCT with complete oversight authority for energy prices and requires market participants to submit certain information to ERCOT, this Court held that the "PUCT's oversight over the market is sufficient to conclude that the BES energy rates are 'filed' within the meaning of the filed rate doctrine."  *Id.* at 510; *see also Util. Choice, L.P. v. TXU Corp.*, 2005 WL 3307524, at *2 (S.D. Tex. 2005) ("[T]he Fifth Circuit has held that the filed rate doctrine bars claims for damages stemming from rates approved by the PUCT in the Texas energy market.").[3]

---

[3] Other courts have similarly concluded that the filed rate doctrine bars challenges to "market rates" where a regulatory agency oversees—but does not necessarily approve—rates.  *See Simon v. KeySpan Corp.*, 694 F.3d 196, 207 (2nd Cir. 2012) ("The rationale behind the filed rate doctrine applies with equal force to [a market-based rate] auction system[.]"); *E. & J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1041 (9th Cir. 2007) (applying filed rate doctrine to "market-based rates" overseen by FERC); *Util. Choice*, 2005 WL 3307524, at *2 n.6 (extending *TCE*'s holding to bilateral transactions in ERCOT).

Despite *TCE*'s clear holding, the Trustee insisted below that ERCOT's $9,000/MWh price at issue here somehow does not qualify as a filed rate. She did not and could not dispute that the same PUCT statutes and regulations that were dispositive in *TCE* remain in force and apply equally to the ERCOT price at issue. *See, e.g.*, Tex. Util. Code §§ 35.004(f), 39.101(a)(1), 39.151; 16 Tex. Admin. Code §§ 25.1(a), 25.501(a). Instead, the Trustee claims that (1) ER~~COT breached its Protocols in~~ charging the price dictated by the PUCT's orders; (2) the PUCT's orders did not mandate ERCOT's $9,000/MWh price; and (3) the PUCT's orders were no longer in force ~~during the fina~~l 33 hours of the $9,000/MWh pricing period. ROA.282, 291-95, 301-05. But those arguments do not offer a way around *TCE* and the filed rate doctrine.

The Trustee's three arguments rest on the same faulty premise—that the price in ERCOT~~'s market~~ constitut~~es a filed~~ rate only when it is based on a *correct* application of the Protocols or mandated by the PUCT. That cann~~ot be squa~~red with *TCE*. On the former, the district court in *TCE* explicitly rejected the same argument and held that~~ the filed~~ rate doctrine bars claims based on "higher prices in the [ERCOT] energy market as a result of ERCOT's fail~~ure to foll~~ow its own protocols." 2004 WL 1777597, at *17. Resisting that conclusion, the Trustee below cited *CenterPoint Energy Entex v. Railroad Commission of Texas*, 208 S.W.3d 608, 622 (Tex. App.—Austin 2006, pet. dism'd), for its remark that "the filed-rat~~e doctrine~~

does not preclude a review based on the charge that a *utility* misapplied its rate." (emphasis added). That case is inapposite because, crucially, the parties in *CenterPoint* first submitted the challenges to the allegedly wrongful rate directly to the Railroad Commission of Texas, and only after that to the court. *Id.* at 613. And the issue there was whether a *utility* had lawfully *implemented* the rate, not whether the rate set by the Railroad Commission was lawful. *Id.* The state court proceedings that followed thus were not a *collateral* attack on the filed rate, which is what the filed rate doctrine bars.

Even accepting *arguendo* that the filed rate doctrine does not preclude review based on the charge that a utility misapplied its rate, it still would not follow that the Trustee could challenge the $9,000/MWh price based on any failure to follow the Protocols. That price—like any other prevailing price in the ERCOT market—*is* the filed rate, not a mere application of it. This Court made that clear in *TCE* when it considered the "filed rates" to be the "wholesale energy rates [*i.e.*, prices] in the [ERCOT] market." *TCE*, 413 F.3d at 508. Here, that is even more clear because the PUCT itself ordered ERCOT to charge the rate at issue.

As to the argument that the price must be mandated by the PUCT to constitute a filed rate, this Court addressed that directly in *TCE* and held that PUCT rate approval was not necessary to invoke the filed rate doctrine: "PUCT's oversight over the market is sufficient to conclude that the [ERCOT] energy rates are 'filed' within

8

the meaning of the filed rate doctrine." *Id.* at 510. In other words, the prices charged by ERCOT in the wholesale market constitute filed rates based on the PUCT's broad oversight authority alone—regardless of any explicit approval from the PUCT. Thus, for purposes of the filed rate doctrine, it matters not whether ERCOT's rate was "unlawful" because it was based on an alleged breach of the Protocols or whether the PUCT's orders mandated ERCOT's $9,000/MWh price or applied to the final 33 hours, as ERCOT's price would be a filed rate in all events due to the PUCT's plenary oversight.

In any event, the PUCT *did* approve the rate at issue here. Recognizing that the ERCOT computer systems were not operating as intended, the PUCT expressly declared that setting prices below the $9,000/MWh maximum price when excessive demand and limited supply are forcing mandatory blackouts "is inconsistent with the fundamental design of the ERCOT market." ROA.186. As the PUCT explained, "[e]nergy prices should reflect scarcity of the supply. If customer load is being shed, scarcity is at its maximum, and the market price for energy needed to serve that load should also be at its highest." ROA.186. The PUCT accordingly directed ERCOT to "ensure that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals." ROA.187. The fact that the PUCT intervened specifically to ensure that the price charged to all market participants reflected the severe scarcity

situation only underscores its regulatory authority and renders patently meritless any contention that the $9,000/MWh price does not constitute a filed rate.

## B. The Trustee's claims impermissibly challenge ERCOT's filed rates.

Because the $9,000/MWh price constitutes a filed rate under *TCE*, the filed rate doctrine plainly bars the Trustee's claims. Indeed, the Trustee attacks that price as "unlawful" over a dozen times in its Amended Complaint. ROA.282, 293-95, 301, 303-04. Yet the filed rate doctrine "bars judicial recourse against a regulated entity based upon allegations that the entity's 'filed rate' is too high, unfair or *unlawful*." *TCE*, 413 F.3d at 507 (emphasis added).

Examining the Amended Complaint in greater detail only further confirms this conclusion. The Trustee explains why it believes that ERCOT's $9,000/MWh price was unlawful—because "ERCOT breached its own Nodal Protocols" in setting that price. ROA.282; *see also* ROA.292 ("Instead of complying with the Protocols' revision procedures, ERCOT decided to breach them."); ROA.293 ("This unauthorized change was not permitted by the February 15 PUCT Order or the Protocols."); ROA.294 ("ERCOT left the HCAP in place for 33 hours after firm load shed had stopped, in breach of the Protocols . . . ."); ROA.295 ("ERCOT unlawfully breached its Protocols when it passed along these improperly high costs to market participants."). Then she explicitly bases Counts I, II, III, IV, and VI of the Amended Complaint on that challenge to ERCOT's "unlawful" price. *Cf. TCE*, 2004 WL

1777597, at *17 (dismissing plaintiff's claim that ERCOT pricing breached its Protocols as barred by the filed rate doctrine).

Count I is an objection to ERCOT's claim for payment based on the allegation that the charges are "[e]xcessive." ROA.300. The Trustee directly challenges the $9,000/MWh price as unlawful: "ERCOT unlawfully changed its calculation of the Reliability Deployment Price Adder to include firm load shed. . . . [T]he purported value of the ERCOT Claim is based on an erroneous calculation performed by ERCOT." ROA.301-02. Then she seeks disallowance of ERCOT's claim to the extent it exceeds the amount that would be due based on a "proper[] calculat[ion] under . . . the Protocols":

> The cost of electricity and ancillary services must be calculated pursuant to the Protocols in effect during Winter Storm Uri, which did not permit any of these actions by ERCOT. . . . The Trustee thus seeks an order under Bankruptcy Code Section 502(b)(1) disallowing the ERCOT Claim to the extent that the asserted amount exceeds the amount properly calculated under the SFA and the Protocols in effect during Winter Storm Uri.

ROA.302.

Count II is a similar objection based on ERCOT's failure to mitigate. ROA.302-03. It too is grounded in the core allegation that "ERCOT breached the . . . Protocols" in arriving at the $9,000/MWh price by "unlawfully chang[ing] the Reliability Deployment Price Adder to include firm load shed" and "unlawfully us[ing] a static value of 20,000 MWs to represent firm load shed." ROA.303.

Count III objects on the basis that the debtor did not receive reasonably equivalent value in exchange for its obligation to pay ERCOT the $9,000/MWh price for the electricity. ROA.303-04. That quickly collapses into yet another way of claiming that the price was unlawful because the Trustee views "reasonably equivalent value" as the (unspecified and potentially unknowable) price that it contends was required to be set under the Protocols: "The Debtors received less than a reasonably equivalent value in exchange for such obligation, as the reasonably equivalent value was required to be set according to the Protocols in effect at the time of Winter Storm Uri, which did not account for firm load shed." ROA.304.

Count IV is a similar objection based on the lack of reasonably equivalent value. ROA.304-05. Here, too, the objection ultimately rests on the notion that ERCOT's $9,000/MWh price was unlawful and thus any obligation pursuant to it was not for reasonably equivalent value: "The ERCOT Claim is an obligation that arose within four years prior to the Petition Date for power sold at the unreasonable and excessive $9,000/MWh price. The Debtors received less than reasonably equivalent value in exchange for such obligation." ROA.305.[4]

The result is the same as it was in *TCE*. There, this Court affirmed the district court's dismissal of antitrust claims based on the filed rate doctrine because those

---

[4] Similarly, to the extent Count VI (Gross Negligence) is based on the notion that ERCOT's pricing actions constituted a tort, ROA.307-08, Calpine agrees with ERCOT that Count VI would also be barred by the filed rate doctrine. *See* ERCOT Br. 40-41.

claims were based on similar challenges to ERCOT's filed rates. *TCE*, 413 F.3d at 507-510. As the district court's opinion explained in more detail, the plaintiff "claim[ed] that it was damaged by having to pay higher prices for electricity in [ERCOT's] BES market as a result of Defendant's alleged economic withholding, physical withholding, market manipulation, monopolization, attempted monopolization and/or conspiracy to monopolize." *TCE*, 2004 WL 1777597, at *13. That ran headlong into the filed rate doctrine because those claims were "based on the rates [the plaintiff] paid in Texas's regulated energy market." *Id.* at *14.

Indeed, in *TCE* the district court also considered and rejected under the filed rate doctrine virtually the same theory of liability the Trustee asserts here:

> TCE alleges that it suffered damages in the form of higher prices in the BES energy market *as a result of ERCOT's failure to follow its own protocols. Any award* of damages on TCE's breach of contract claim would require the court to determine what the rate for electricity would have been absent ERCOT's alleged breach, a practice barred by the filed rate doctrine.

*Id.* at *17 (emphasis added). A claim based on ERCOT's failing to follow the Protocols in setting the price remains barred by the filed rate doctrine now just as it was then. There, as here, such claims against ERCOT must be dismissed "pursuant to the filed rate doctrine." *Id.*

Other courts have determined that similar claims were barred by the filed rate doctrine as well. For example, in *Public Utility District No. 1 v. IDACORP Inc.*, 379 F.3d 641 (9th Cir. 2004), the plaintiff brought several claims that sought relief in an

amount equal to the difference between the market price for energy during an energy crisis, which was considered a filed rate, and the "fair value" of that energy absent purported market dysfunction. *Id.* at 651. The Ninth Circuit affirmed dismissal of the claims because "[t]he relief sought by [the plaintiff] would require the court to set damages by assuming a hypothetical rate, the 'fair value,' in violation of the filed rate doctrine." *Id.*; *see also E. & J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1043 (9th Cir. 2007) (holding that any claims which challenged wholesale rates within FERC's jurisdiction, including claims under the California Uniform Fraudulent Transfer Act, were barred by the filed rate doctrine).

Accordingly, regardless of how the Trustee frames her challenge or characterizes ERCOT's rate, the dispositive point is that the Trustee is attacking the ERCOT's wholesale energy price as "unlawful." ROA.282, 293-95, 301, 303-04. That is precisely what the filed rate doctrine prohibits.

That is not to say that the $9,000/MWh price is forever inviolate and immune from judicial scrutiny. Filed rates remain subject to direct challenge through the specified mechanisms of review, such as through ERCOT's own administrative process, the PUCT, and the Texas state courts. *Cf. ERCOT, Inc. v. Just Energy Tex., L.P.*, 57 F.4th 241, 254-55 (5th Cir. 2023) (abstaining under *Burford* so that similar challenge to ERCOT's Winter-Storm rates can proceed through ERCOT, PUCT, and state-court review process). But the filed rate doctrine forecloses all collateral

attacks that a "'filed rate' is too high, unfair or unlawful" that parties may lodge through other claims in other proceedings. *TCE*, 413 F.3d at 507. The doctrine thereby ensures that challenges to that $9,000/MWh price or any other filed rate proceed through an orderly, centralized process that will result in a final resolution for all, rather than pell-mell suits in various individual state and federal actions asserting all manner of individual claims. Without a marketwide decision by the assigned regulatory bodies and courts, not only would chaos and regulatory uncertainty abound, but "victorious plaintiffs would wind up paying less than non-suing ratepayers" despite the same filed rate applying to them all. *Rothstein*, 794 F.3d at 265; *see also TCE*, 2004 WL 1777597, at *9 ("As the Supreme Court explained in *Keogh*, any attempt by a court to determine relief from previously assessed rates would lead to complaining parties paying less than those who are not suing.").

The Trustee's collateral attacks on the lawfulness of ERCOT's $9,000/MWh price contravene the core of the filed rate doctrine and therefore should be dismissed.

## III. This Court's recent decision in *ERCOT, Inc. v. Just Energy Texas, L.P.* further supports application of the filed rate doctrine here.

These are not new issues. This Court rejected similar bankruptcy claims against ERCOT only a few months ago in *Just Energy*. Although the Court based its ruling on abstention grounds—a result that Calpine fully supports here—its reasoning is equally applicable to the filed rate doctrine.

The Court's explanation of the proper procedural path for challenging ERCOT's prices is particularly relevant here, as it charts the course that any ERCOT price challenge must follow through the prescribed channels of state administrative and judicial review:

> Texas law mandates that those types of challenges—*i.e.*, challenges to invoices and regulatory actions—must be filed with ERCOT in the first instance, with a right of appeal to the PUCT, and then to Travis County district court. . . . Here, the root issue falls within the exclusive jurisdiction of the state court. The only way that Just Energy can get the relief it seeks—at least $274 million of the $335 million paid—is for a court to answer the question central to Just Energy's case: Did ERCOT charge a lawful filed rate calculated in accordance with market-based protocols? If the answer is yes, the $335 million dollar invoice stands, and no money is returned to Just Energy. If the answer is no, Just Energy can claw black some or all of its money through its bankruptcy action. Only one court is permitted to answer Just Energy's $335-million-dollar question: Travis County district court.

*Just Energy*, 57 F.4th at 254.

The Trustee's claims in this case turn on that same key question: "Did ERCOT charge a lawful filed rate calculated in accordance with market-based protocols?" *Id.* "Texas law mandates that [these] types of challenges—*i.e.*, challenges to invoices and regulatory actions—must be filed with ERCOT in the first instance, with a right of appeal to the PUCT, and then to Travis County district court." *Id.* This collateral attack on a filed rate is not the Trustee's proper route to any potential relief.

## CONCLUSION

Calpine joins ERCOT in requesting that this Court reverse the decision below insofar as it permitted some of the Trustee's claims to survive and affirm the dismissal of the Trustee's remaining claims.

Respectfully submitted,

BAKER BOTTS L.L.P.

By: */s/ Aaron M. Streett*
George H. Fibbe
Aaron M. Streett
J. Mark Little
910 Louisiana Street
Houston, Texas 77002
Telephone: (713) 229-1234
george.fibbe@bakerbotts.com
aaron.streett@bakerbotts.com
mark.little@bakerbotts.com

*Counsel for Amicus Curiae Calpine Corporation*

**CERTIFICATE OF SERVICE**

This will certify that a true and correct copy of the above document was served on this the 4th day of April, 2023, via the Court's CM/ECF system on all counsel of record.

/s/ Aaron M. Streett
Aaron M. Streett
*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 4,133 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using the Microsoft Office Word 2010 word processing software in 14-point Times New Roman type style.

/s/ Aaron M. Streett
Aaron M. Streett
*Counsel for Amicus Curiae*