No. 22-20603

*In the*

# United States Court of Appeals
*for the*

# Fifth Circuit

---

IN RE ENTRUST ENERGY, INC., *ET AL.*,

*Post-Confirmation Debtors*,

ANNA PHILLIPS, AS LIQUIDATING TRUSTEE OF THE
ENTRUST LIQUIDATING TRUST,

*Appellee/Cross-Appellant*,

– v –

ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.,

*Appellant/Cross-Appellee.*

---

On Appeal from the U.S. Bankruptcy Court for the
Southern District of Texas
Adv. No. 22-3018 (DRJ)

---

**BRIEF OF APPELLEE/CROSS-APPELLANT**

---

Charles R. Gibbs
Debbie E. Green
McDermott Will & Emery LLP
2501 North Harwood Street
Dallas, Texas 75201
(214) 295-8000

Darren Azman
McDermott Will & Emery LLP
One Vanderbilt Avenue
New York, New York 10017
(212) 547-5400

*Counsel for Appellee/Cross-Appellant*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that Strategic Power Holdings, LLC is the sole parent of the Debtors in the bankruptcy.[1] American Electricity & Gas Holdings, L.L.C. and Nippon Gas USA, Inc. each hold a 50% equity interest in Strategic Power Holdings. The undersigned counsel of record also certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible recusal.

| | |
|---|---|
| **Appellee/Cross-Appellant:** | Anna Phillips, as Liquidating Trustee of the Entrust Liquidating Trust |
| **Counsel:** | Charles R. Gibbs |
| | Debbie E. Green |
| | MCDERMOTT WILL & EMERY LLP |
| | 2501 North Harwood Street, Ste. 1900 |
| | Dallas, Texas 75201-1664 |
| | Telephone: (214) 295-8000 |
| | Facsimile: (972) 232-3098 |
| | crgibbs@mwe.com |
| | dgreen@mwe.com |
| | |
| | Darren Azman |
| | MCDERMOTT WILL & EMERY LLP |
| | One Vanderbilt Avenue |

---

[1] The Debtors in the chapter 11 cases that are subject to the Plan and the Trust Agreement are: Entrust Energy, Inc.; Entrust Treasury Management Services, Inc.; Entrust Energy East, Inc.; Power of Texas Holdings, Inc.; Akyta Holdings, Inc.; Enserve, Inc.; Akyta, Inc.; Energistics, Inc.; and NGAE, Inc.

No chapter 11 plan has been confirmed in the cases of the following Debtors: Knocked, Corp.; SPH Investments, Inc.; Akyta IP, Inc.; Surge Direct Sales, Inc.; Entrust Energy Operations, Inc.; and Strategic Power Holdings, LLC.

New York, New York 10017
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
dazman@mwe.com

**Appellant/Cross-Appellee:** Electric Reliability Council of Texas, Inc.

**Counsel:** Jamil N. Alibhai
jalibhai@munsch.com
Kevin M. Lippman
klippman@munsch.com
MUNSCH HARDT KOPF & HARR, P.C.
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

Wallace B. Jefferson
wjefferson@adjtlaw.com
Nicholas Bacarisse
nbacarisse@adjtlaw.com
ALEXANDER DUBOSE & JEFFERSON LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701-3562
Telephone: (512) 482-9300
Facsimile: (512) 482-9303

**Interested Party:** Calpine Corporation

**Counsel:** George Fibbe
Aaron M. Streett
J. Mark Little
BAKER BOTTS LLP
910 Louisiana Street
Houston, TX 77002

Dated: June 2, 2023                    Respectfully submitted,

*/s/ Debbie E. Green*
Debbie E. Green
*Counsel for Appellee/Cross-Appellant*

**STATEMENT REGARDING ORAL ARGUMENT**

Appellee/Cross-Appellant believes oral argument may aid in the court's decisional process in this case, particularly given the significant issues regarding the ability of bankruptcy courts to adjudicate hundred-million-dollar claims regarding state-regulated utilities. For the reasons explained herein, this court's decision in *Electric Reliability Council of Texas, Inc. v. Just Energy Texas, L.P.*, 57 F.4th 241 (5th Cir. 2023) does not control the case, and oral argument will aid the court in resolving the weighty issues presented on appeal.

# TABLE OF CONTENTS

Certificate of Interested Persons ................................................................. i

Statement Regarding Oral Argument ...................................................... iii

Table of Authorities ............................................................................... v

Introduction ............................................................................................ 1

Jurisdiction ............................................................................................. 3

Issues Presented for Review .................................................................. 3

Statement ................................................................................................ 3

    A.   Regulatory Background ................................................................ 3

    B.   Factual Background ...................................................................... 5

        1.   ERCOT fails to prepare for Winter Storm Uri. ................. 5

        2.   As market prices rise, ERCOT seeks an order from the PUCT authorizing maximum pricing. ........................... 6

        3.   ERCOT breaches the Protocols to peg prices to $9,000/MWh without express PUCT authorization. ........... 8

        4.   ERCOT's price manipulation drives Entrust to insolvency. ....................................................................... 9

        5.   ERCOT effects a mass transition of Entrust's customers to a provider of last resort .............................. 11

    C.   Procedural Background ............................................................... 12

Summary of the Argument .................................................................... 13

Argument .............................................................................................. 17

I.   Abstention is not warranted ............................................................ 17

    A.   *Just Energy* does not control this case .................................... 17

    B.   The *Burford* factors do not favor abstention. ......................... 24

II.   The filed rate doctrine does not bar the Trustee's claims. .............. 27

    A.   The Trustee's claim objections do not challenge a filed rate authorized by the PUCT. ......................................... 27

    B.   The Trustee's claim objections request relief well within the bankruptcy court's province. ................................. 34

III.   The PUCT is not a required party. ....................................35

    A.   The PUCT is not a necessary party. ........................36

    B.   The PUCT is not an indispensable party. ..................39

IV.   Sovereign immunity does not bar any of the Trustee's claims. .......................41

    A.   ERCOT is not an "arm of the state" entitled to sovereign immunity. ..................................42

        1.   ERCOT is not funded by the state treasury. ....................................44

        2.   State statutes and case law characterize ERCOT as independent from the state. ..................................46

        3.   ERCOT has significant autonomy. ..................................49

        4.   The remaining factors weigh against immunity. ...........................51

    B.   Even if ERCOT were entitled to sovereign immunity, it has waived it. ..................................52

V.   The Trustee's negligence claim is proper. .........................54

VI.   The bankruptcy court erred in dismissing the takings claim. .........................57

Conclusion ..................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Bank & Tr. Co. of Opelousas v. Dent*,
    982 F.2d 917 (5th Cir. 1993) ................................................................. 19

*Anderson v. United States*,
    520 F.2d 1027 (5th Cir. 1975) ............................................................. 22

*Arkansas Elec. Co-op. Corp. v. Arkansas Pub. Serv. Comm'n*,
    461 U.S. 375 (1983) .............................................................................. 59

*Arkansas-Louisiana Gas Co. v. Hall*,
    453 U.S. 571 (1981) ................................................................ 27, 28, 29

*Belloti v. Baird*,
    428 U.S. 132 (1976) ................................................................ 13, 20, 24

*Meyers ex rel. Benzing v. Texas*,
    410 F.3d 236 (5th Cir. 2005) ............................................................... 42

*Black Radio Network, Inc. v. NYNEX Corp.*,
    44 F. Supp. 2d 565 (S.D.N.Y. 1999) .................................................. 28

*Boman v. Birmingham Transit Co.*,
    280 F.2d 531 (5th Cir. 1960) ............................................................... 60

*Bonin v. Sabine River Auth.*,
    65 F.4th 249 (5th Cir. 2023) ......................................................... *passim*

*Braunstein v. McCabe*,
    571 F.3d 108 (1st Cir. 2009) ............................................................... 23

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
    531 U.S. 288 (2001) ................................................................ 15, 59, 60

*Broad. Music, Inc. v. Armstrong*,
    2013 WL 3874082 (W.D. Tex. July 24, 2013) .................................... 38

**Cases—continued**

*Brown v. MCI WorldCom Network Servs., Inc.*,
277 F.3d 1166 (9th Cir. 2002) .................................................. 28

*Burford v. Sun Oil Co*,
319 U.S. 315 (1943) .......................................................... *passim*

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*,
526 U.S. 687 (1999) ............................................................. 22

*Daniel v. Univ. of Tex. Sw. Med. Ctr.*,
960 F.3d 253 (5th Cir. 2020) .................................................. 44

*Daves v. Dallas County*,
22 F.4th 522 (5th Cir. 2022) .................................................. 18

*Degan v. Bd. of Trustees of Dallas Police & Fire Pension Sys.*,
956 F.3d 813 (5th Cir. 2020) .................................................. 57

*Matter of Dierschke*,
975 F.2d 181 (5th Cir. 1992) .................................................. 25

*Drew v. MCI Worldcom Mgmt. Co., Inc.*,
1999 WL 1087470 (N.D. Tex. Dec. 1, 1999) ........................................ 28

*Duncan v. Poythress*,
657 F.2d 691 (5th Cir. 1981) .................................................. 20

*Edward D. Jones & Co. v. Fletcher*,
975 SW.2d 539 (Tex. 1998) .................................................. 55

*Elephant Ins. Co., LLC v. Kenyon*,
644 S.W.3d 137 (2022) .................................................. 55, 56

*Entex, A Division of Noram Energy Corp. v. Gonzalez*,
94 S.W.3d 1 (Tex. App.—Houston [14th Dist.] 2002) .......................... 57

*ERCOT v. CPS Energy*,
648 S.W.3d 520 (Tex. App.—San Antonio 2021) ................................ 47

*ERCOT v. Just Energy Texas, L.P.*,
57 F.4th 241 (5th Cir. 2023) ............................................. *passim*

**Cases—continued**

*Evans v. Newton*,
   382 U.S. 296 (1966).................................................................. 59

*Evanston Ins. Co. v. Jimco, Inc.*,
   844 F.2d 1185 (5th Cir. 1988) ................................................ 19

*Fed. Ins. Co. v. Singing River Health Sys.*,
   850 F.3d 187 (5th Cir. 2017) ................................................... 39

*Felder v. Estelle*,
   693 F.2d 549 (5th Cir. 1982) ................................................... 19

*Flagg v. Yonkers Sav. & Loan Ass'n*,
   396 F.3d 178 (2d Cir. 2005) .................................................... 59

*Fredonia Broad. Corp. v. RCA Corp.*,
   481 F.2d 781 (5th Cir. 1973) .............................................. 15, 58

*Free Enter. Fund v. PCAOB*,
   561 U.S. 477 (2010).................................................................. 49

*Grace Ranch, L.L.C. v. BP Am. Prod. Co.*,
   989 F.3d 301 (5th Cir. 2021) ....................................... 13, 25, 26

*Hess v. Port-Auth. Trans-Hudson Corp.*,
   513 U.S. 30 (1994).................................................................... 44

*HWY 3 MHP, LLC v. ERCOT*,
   462 S.W.3d 204 (Tex. Ct. App.—Austin 2015)................... 46, 47

*Jacintoport Corp. v. Greater Baton Rouge Port Com'n*,
   762 F.2d 435 (5th Cir. 1985) .......................................... *passim*

*Knick v. Twp. of Scott*,
   139 S. Ct. 2162 (2019)............................................................. 57

*In re Lazar*,
   237 F.3d 967 (9th Cir. 2001) ................................................... 53

*Lee v. Anthony Lawrence Collection, L.L.C.*,
   47 F.4th 262 (5th Cir. 2022) .............................................. 39, 40

**Cases—continued**

*Louisiana Land & Expl. Co. v. Amoco Prod. Co.,*
    878 F.2d 852 (5th Cir. 1989) .................................................. 28

*Louisiana Pub. Serv. Comm'n v. FERC,*
    771 F.3d 903 (5th Cir. 2014) .................................................. 28

*Luminant Energy Co. LLC v. Pub. Util. Comm'n of Texas,*
    665 S.W.3d 166 (Tex. App.—Austin 2023).............................8

*McDonald v. Bd. of Miss. Levee Com'rs,*
    832 F.2d 901 (5th Cir. 1987) .................................................. 43

*Hood ex rel. Mississippi v. City of Memphis,*
    570 F.3d 625 (5th Cir. 2009) .................................................. 36

*Mitchell v. State Farm Fire & Cas. Co.,*
    954 F.3d 700 (5th Cir. 2020) .................................................. 54

*Moss v. Princip,*
    913 F.3d 508 (5th Cir. 2019) .................................................. 40

*In re Mushroom Transp. Co., Inc.,*
    382 F.3d 325 (3d Cir. 2004) .................................................. 23

*N. Valley Commc'ns, LLC v. MCI Commc'ns Servs., Inc.,*
    2008 WL 2627519 (D.S.D. June 26, 2008)...................................... 28, 32

*Nat'l Liability & Fire Ins. Co. v. R&R Marine, Inc.,*
    756 F.3d 825 (5th Cir. 2014) .................................................. 53

*Occidental Chem. Corp. v. Louisiana Pub. Serv. Comm'n,*
    494 F. Supp. 2d 401 (M.D. La. 2007) .................................................. 28

*Ohio Bureau of Emp't Servs. v. Hodory,*
    431 U.S. 471 (1977)....................................................... 13, 18, 19

*Panda Power Generation Infrastructure Fund, LLC v. ERCOT,*
    641 S.W.3d 893 (Tex. App.—Dallas 2022) ......................... 42, 49, 50, 51

*Pendergrass v. Greater New Orleans Expressway Comm'n,*
    144 F.3d 342 (5th Cir. 1998) .................................................. 50

**Cases—continued**

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
    572 U.S. 663 (2014)....................................................................... 24

*Plant v. Blazer Fin. Servs., Inc. of Ga.*,
    598 F.2d 1357 (5th Cir. 1979) ..................................................... 53

*Praesel v. Johnson*,
    967 S.W.2d 391 (Tex. 1998) ............................................... 56, 57

*Preston Hollow Cap., L.L.C. v. Cottonwood Dev. Corp.*,
    23 F.4th 550 (5th Cir. 2022) ........................................................ 57

*Providence Behavioral Health v. Grant Road Public Utility Dist.*,
    902 F.3d 448 (5th Cir. 2018) ....................................................... 52

*Provident Tradesmens Bank & Tr. Co. v. Patterson*,
    390 U.S. 102 (1968)...................................................................... 39

*Pulitzer–Polster v. Pulitzer*,
    784 F.2d 1305 (5th Cir.2006) ..................................................... 36

*Quackenbush v. Allstate Ins. Co.*,
    517 U.S. 706 (1996).......................................................... *passim*

*Randleman v. Fid. Nat. Title Ins. Co.*,
    465 F. Supp. 2d 812 (N.D. Ohio 2006) .................................... 28

*Regents of Univ. of Cal. v. Doe*,
    519 U.S. 425 (1997)...................................................................... 42

*Roberts v. Cameron-Brown Co.*,
    556 F.2d 356 (5th Cir. 1977) ...................................................... 59

*Rosborough v. Mgmt. & Training Corp.*,
    350 F.3d 459 (5th Cir. 2003) ....................................................... 59

*Ross v. Houston Indep. Sch. Dist.*,
    559 F.2d 937 (5th Cir. 1977) ...................................................... 20

*S. Cal. Edison Co. v. Lynch*,
    307 F.3d 794 (9th Cir. 2002) ...................................................... 18

# Cases—continued

*Saldano v. Roach*,
   363 F.3d 545 (5th Cir. 2004) ..................................................... 38

*Saloom v. Texas Dep't of Fam. & Child Protective Servs.*,
   578 F. App'x 426 (5th Cir. 2014) ............................................. 23

*Stratta v. Roe*,
   961 F.3d 340 (5th Cir. 2020) ............................................ 17, 58

*In re Supreme Beef Processors, Inc.*,
   468 F.3d 248 (5th Cir. 2006) ..................................................... 53

*Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*,
   952 S.W.2d 454 (Tex. 1997) ..................................................... 48

*Texas Com. Energy v. TXU Energy, Inc.*,
   2004 WL 1777597 (S.D. Tex. June 24, 2004)......................... 32

*Texas Com. Energy v. TXU Energy, Inc.*,
   413 F.3d 503 (5th Cir. 2005) ............................... 27, 28, 32, 33

*Tex. Home Mgmt., Inc. v. Peavy*,
   89 S.W.3d 30 (Tex. 2002) ..................................................... 55

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001)..................................................... 48

*U.S. Fid. & Guar. Co. v. Quinn Bros. of Jackson, Inc.*,
   384 F.2d 241 (5th Cir. 1967) ..................................................... 59

*In re United Operating, LLC*,
   540 F.3d 351 (5th Cir. 2008) ..................................................... 21

*Vogt v. Bd. of Com'rs of Orleans Levee Dist.*,
   294 F.3d 684 (5th Cir. 2002) ............................................ 44, 50

*Webb v. B.C. Rogers Poultry, Inc.*,
   174 F.3d 697 (5th Cir. 1999) ....................................... 14, 22, 23

*Whalen v. Carter*,
   954 F.2d 1087 (5th Cir. 1992) ..................................................... 40

**Cases—continued**

*Wilson v. Valley Elec. Membership Corp.*,
8 F.3d 311 (5th Cir. 1993) ...................................................................... 25

**Statutes, regulations, and rules**

11 U.S.C.
§ 106(b) ......................................................................................... 15, 52
§ 305(a), (c) ....................................................................................... 24
§ 542 ................................................................................................... 23

28 U.S.C.
§ 158(d)(2) ..............................................................................................3
§ 1334(c) ....................................................................................... 13, 24

Tex. Gov't Code § 2001.038 ......................................................... 37

Tex. Gov't Code § 2001.038 ......................................................... 37

Tex. Util. Code
§ 38.202(d) ......................................................................................... 51
§ 39.101 ............................................................................................... 60
§ 39.151(a)(2) ......................................................................... 4, 15, 49
§ 39.151(d) ......................................................................................... 51
§ 39.151(d-1), (e) ............................................................................. 45
§ 39.151(g), (g-1)-(g-6) ...................................................................50
§ 39.1515(a) ....................................................................................... 51
§ 39.1516 ............................................................................................ 51
§ 39.917 .............................................................................................. 51

16 Tex. Admin. Code

§ 25.21 ................................................................................. 11

§ 25.43(a) .............................................................................. 60

§ 25.43(a), (l), (p)(10) ........................................................... 11

§ 25.43(o)(2) ......................................................................... 11

§ 25.200(d) ........................................................................... 47

§ 25.361(b) ...................................................................... 55, 56

§ 25.361(c) ............................................................................ 47

§ 25.362(j) ............................................................................. 47

§ 25.363(e), (g) ..................................................................... 45

§ 25.365(c)(1) .................................................................. 10, 32

§ 25.501(a) ............................................................................ 37

Fed. R. Civ. P.

13(a) .................................................................................... 53

19(a) ...................................................................... 14, 36, 38

19(b) ................................................................ 14, 39, 40, 41

## Other Authorities

ERCOT, *Fact Sheet* ............................................................ 42

London Economics International, Analysis of ERCOT Market Prices
During February 2021 Winter Storm Event (May 28, 2021) ................. 35

Tex. Sunset Advisory Comm'n, *Agencies Subject to Sunset
Review* ............................................................................... 48

Charles Alan Wright et al.,
5 *Federal Practice & Procedure* § 1283 (4th ed.) ................................. 58

## INTRODUCTION

This case began at ERCOT's behest. After the debtors in the bankruptcy—hereinafter "Entrust"—filed for relief under Chapter 11, ERCOT willingly entered the fray to file a proof of claim for nearly $300 million in what it says are unpaid electricity bills.

As she is entitled to do, the Trustee responded by contesting ERCOT's proofs of claim. For one thing, Entrust purportedly owed the claimed amount only because ERCOT flagrantly violated its rate-setting protocols to charge vastly inflated electricity prices during Winter Storm Uri. For another, ERCOT's claims are offset by the damages it caused through its gross negligence leading up to and during the winter storm and by the massive taking of Entrust's customer base it effected in the storm's aftermath.

Now that the Trustee has had early success in defending those arguments, ERCOT evidently regrets its decision to submit to the bankruptcy court's authority. ERCOT insists that the bankruptcy court must abstain from the proceedings because it touches upon state prerogatives. But ERCOT cannot have its cake and eat it too. After ERCOT asked the bankruptcy court for its cut of the liquidating trust, the bankruptcy court properly held that it need not abstain from determining what that cut should be, delivering prompt and just relief to ERCOT as well as the numerous other creditors whose claims ERCOT now seeks to put on ice. This Court's recent decision in *ERCOT v. Just Energy*, which shares in common with this case ERCOT's failures during winter storm Uri but little else, does not compel otherwise.

1

ERCOT's other attempts to neutralize the bankruptcy court's review of the Trustee's claim are no more successful. ERCOT argues that its astronomical charges are unimpeachable under the filed rate doctrine. But the Trustee's complaint is premised on *enforcing*, not avoiding, the filed rate spelled out in ERCOT's binding pricing protocols. ERCOT argues that its regulator, the PUCT, needed to be joined to this lawsuit, but the PUCT has no interest in the litigation and will not be bound by the outcome. ERCOT argues that it is protected by sovereign immunity, but it is a private company and not an arm of the state.

At bottom, ERCOT seems to believe that it may stake an audacious claim in federal bankruptcy proceedings but then wrap itself in a quilt of reasons why the bankruptcy court is powerless to determine what ERCOT is actually owed. The bankruptcy court properly saw through ERCOT's gambit, and this Court should affirm.[2]

---

[2] The sole exception is the bankruptcy court's erroneous dismissal of the Trustee's Takings Clause claim, which should be reversed. *See* pages 57-60, *infra*.

# JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 158(d)(2). The bankruptcy court entered its order on September 20, 2022. ROA.475. Both parties timely filed a notice of appeal. ROA.478; ROA.485. This Court granted both parties' petitions for direct review following the bankruptcy court's certification of the issues.

# ISSUES PRESENTED FOR REVIEW

1. Did the bankruptcy court correctly deny in part ERCOT's motion to dismiss?

    a. Did the bankruptcy court abuse its discretion by declining to abstain under *Burford*?

    b. Does the filed rate doctrine preclude the Trustee's claims?

    c. Did the bankruptcy court abuse its discretion by holding that the PUCT is not a necessary and indispensable party?

    d. Did the Trustee sufficiently plead that ERCOT breached a negligence duty?

    e. Is ERCOT, a private entity, entitled to sovereign immunity?

2. Did the bankruptcy court err by dismissing the Trustee's Fifth Amendment takings claim?

# STATEMENT

## A.     Regulatory Background

The Electricity Reliability Council of Texas, Inc. ("ERCOT") is the independent system operator of Texas's intrastate electricity grid. Known as the Texas Interconnection, the grid delivers power to more than 26 million Texas customers. In its

role as the independent system operator, ERCOT is responsible for "ensur[ing] the reliability and adequacy of the" Texas Interconnection. Tex. Util. Code § 39.151(a)(2).

ERCOT manages the Texas Interconnection according to the Nodal Protocols ("the Protocols"), a set of comprehensive policies that govern every aspect of ER-COT's system. ROA.284. All market participants agree to be bound by the Protocols when they execute a Standard Form Market Participant Agreement with ERCOT. ERCOT possesses the authority to revise the protocols, including on an urgent basis, but it must do so in strict adherence to standards described in the Protocols. ROA.292.

The Texas Interconnection is a competition-based system that relies on market forces rather than regulators to determine prices. ERCOT thus manages a real-time, wholesale electricity market, where energy generators compete to sell electricity by placing bids to provide power according to ERCOT's projections of systemwide de-mand. ROA.285. ERCOT is the "central counterparty" to all transactions on the grid, meaning it is ordinarily the sole buyer of power from providers and the sole seller of power to customers. ROA.285.

The prices ERCOT charges customers are largely a function of the prices at which suppliers offer to sell power and the demands of the system. Together, these factors establish a "locational marginal price." ROA.285. However, that figure can be enhanced by applying "price adders" specified in the Protocols. ROA.285-286. One such price adder is the "Reliability Deployment Price Adder," which accounts

for specific measures ERCOT may implement during scarcity conditions to shore up the electricity market. ROA.286. The Protocols also establish a maximum price, dubbed the high system-wide offer cap, or "HCAP," which was $9,000/MWh during the relevant period. ROA.285.

ERCOT is a private non-profit corporation. Its management of the Texas Interconnection is overseen by the Public Utility Commission of Texas ("PUCT").

### B. Factual Background

#### 1. *ERCOT fails to prepare for Winter Storm Uri.*

For at least a decade, ERCOT was aware that the Texas Interconnection was gravely vulnerable to catastrophic failure from severe winter weather. Indeed, in 2011, millions of Texans went days without power under ERCOT's watch after an onslaught of severe winter storms. ROA.288. According to a federal report, ERCOT's failure to ensure that power generators were properly winterized was a major contributing factor to the widespread shortages. ROA.288. In the winter of 2020-2021, ERCOT was primed to anticipate another such event after its own meteorologist reported in November of 2020 that weather patterns made a severe winter event likely. ROA.288-289.

That prediction came true. On February 13, 2021, Winter Storm Uri, an historic blast of arctic air, engulfed Texas, delivering subfreezing temperatures across the state that lasted for multiple days. ROA.288. Having failed to learn the lessons of 2011 or heed the warnings of its meteorologist, ERCOT was once again caught flat-footed. Just when demand for electricity began to skyrocket as Texans attempted

to heat their homes and businesses, capacity on the grid began to plummet because generators were not adequately winterized. ROA.289.

By the early morning of February 15, 2021, more than 35,000 MWs of generation capacity was offline because of the cold temperatures. ROA.289-290. In response to the emergency conditions and lack of generation capacity, ERCOT began ordering rolling blackouts for Texas residential customers, known as "firm load shed." ROA.290.

>    2.    *As market prices rise, ERCOT seeks an order from the PUCT*
>           *authorizing maximum pricing.*

Predictably, prices on ERCOT's electricity market began to rise as demand increased and capacity fell. ROA.290. These price fluctuations were in accordance with the Protocols; they were based on offers from providers, the demands of the system, and price adders as allowed by the Protocols. Prices occasionally approached the $9,000/MWh HCAP value but never met it. ROA.290. For much of February 14 and February 15, even after ERCOT directed firm load shed, electricity was clearing for less than $2,000/MWh. ROA.290.

Those increased prices—twenty times the normal market price or more—did not satisfy ERCOT. ERCOT's CEO, William Magness—under pressure from other market participants—wanted prices to climb even higher. ROA.290. Magness sought to peg prices to the HCAP level of $9,000/MWh for the duration of the storm. ROA.290. Of course, ERCOT's market-based system could have produced that result naturally, if heightened demand and limited supply had driven prices to that

point. But applying the Protocols as designed, ERCOT's system was yielding much lower prices. Critically, the factors considered under the Reliability Deployment Price Adder in ERCOT's protocols excluded firm load shed. ROA.292-293. In other words, ERCOT was forbidden by its own rules from accounting for firm load shed in adjusting the price of electricity.

Determined nonetheless to drive prices up, but lacking authority to do so, Magness turned to the PUCT for cover to increase prices. ROA.290-291. ERCOT hastily drafted an order for the PUCT to rubber-stamp, which it did following slight changes by PUCT staff and only six minutes of deliberation. ROA.291. This first PUCT order went into effect at 5:20 p.m. on February 15, 2021.[3] ROA.291.

The February 15 PUCT order "direct[ed] ERCOT to ensure that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals." ROA.291. It also explained that, "[i]f customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at [its] highest." ROA.292. However, the PUCT order contained no specific instructions describing how ERCOT should implement that policy. In subsequent court filings pertaining to these events, the PUCT has agreed that its order "provided no further instructions to ERCOT about what adjustments should be made or how ERCOT should make them" and that it did not "make self-executing statements

---

[3] The PUCT issued a second order on February 16 that reiterated the substance of the earlier order but struck a retroactivity provision. ROA.293. These two orders are collectively referred to as the "PUCT orders."

applicable to market participants that 'electricity will be automatically priced at the $9,000 system-wide offer cap.'"[4]

> 3. *ERCOT breaches the Protocols to peg prices to $9,000/MWh without express PUCT authorization.*

The PUCT orders in hand, ERCOT proceeded down a path of unprecedented action with the single-minded goal of extracting the maximum price for electricity as long as it could.

ERCOT immediately responded to the February 15 PUCT order by unilaterally altering the criteria within the Reliability Deployment Price Adder to include firm load shed. ROA.292-293. It also adjusted the method for calculating the price adder to account for the new variable in a way that would temporarily peg the adjusted price to $9,000/MWh. ROA.292-293. These actions were not consistent with the Protocols, since firm load shed was not, at that time, a factor under the Reliability Deployment Price Adder. ROA.292-293. Nor did ERCOT implement these changes to the Protocols using the revision methods they prescribed, including those available in urgent situations. ROA.292-293.

---

[4] *See* Brief for Appellee at 9, *Luminant Energy Co. v. PUCT*, No. 03-21-00098-CV (Tex. App., 3d Dist. Sept. 2, 2021) ("*Luminant* Br."), https://perma.cc/2SJ7-XDZ5. The Court of Appeals of Texas disagreed with the PUCT that its orders were not directives to ERCOT to increase prices. *See Luminant Energy Co. LLC v. Pub. Util. Comm'n of Texas*, 665 S.W.3d 166, 187 (Tex. App.—Austin 2023). The case is currently pending before the Texas Supreme Court. *See PUCT v. Luminant Energy Co.*, No. 23-0231 (Tex.).

Prices immediately surged to the HCAP level of $9,000/MWh, where they would remain until February 19, 2021. ROA.294. ERCOT announced the change only after it had gone into effect, issuing a market notice the night of February 15, 2021, stating that it had "already [] implemented" the adjustment. ROA.293.

Shortly after midnight on February 17, 2021, as conditions slowly improved, firm load shed began to decrease. Rather than allow electricity prices to decrease accordingly, however, ERCOT implemented yet another unilateral change that evening. ERCOT adjusted the Reliability Deployment Price Adder to reflect a static value of 20,000 MW of firm load shed rather than the real-time amount. ROA.293-294. At the time, this was more than double the amount of firm load shed operating in the market. ROA.294.

Once again, ERCOT announced this change only after it had already gone into effect, at 8:50 p.m. on February 17. It also informed market participants that, "[o]nce ERCOT is no longer instructing firm Load shed, the adjustment will be set to 0, as it would be in the previous implementation." ROA.294.

Three hours later, ERCOT broke that promise. Just before midnight that same night, firm load shed dropped to zero MW. Nonetheless, ERCOT continued to apply the HCAP price for 33 additional hour*s*, until 9:00 a.m. on February 19. ROA.294.

    4.    *ERCOT's price manipulation drives Entrust to insolvency.*

ERCOT's actions during the winter storm were devastating for Texas electricity customers and have been harshly criticized. For instance, the PUCT's Independent Market Monitor, tasked with "[d]etect[ing] and prevent[ing] market

manipulation strategies and market power abuses" (16 Tex. Admin. Code § 25.365(c)(1)), described ERCOT's actions after firm load shed had subsided as an "inappropriate pricing intervention" that "resulted in $16 billion in additional costs to ERCOT's market." ROA.294-295.

Thanks to these actions, numerous customers of ERCOT's electricity market unexpectedly received exorbitant electricity bills.

Entrust was one such company. Entrust was a retail energy company headquartered in Houston, Texas, and was once heralded as Houston's fastest-growing retail energy provider. ROA.287. Entrust and its affiliate Power of Texas (collectively, "Entrust") were in the business of purchasing energy, including electricity from the Texas Interconnection, and selling and delivering it to residential and commercial customers in several states. ROA.287.

Entrust had responsibly hedged against extreme fluctuations in the electricity market by entering into a long-term contract with a major energy company to supply most of Entrust's energy inventory. ROA.295-296. However, at the onset of Winter Storm Uri, that company unilaterally terminated the contract, leaving Entrust with no choice but to satisfy its obligations by purchasing all of its electricity from ERCOT's market, where prices soon skyrocketed to the $9,000/MWh HCAP level thanks to ERCOT's actions. ROA.296.

In total, Entrust's purported electricity bills amounted to nearly $300 million, which Entrust was unable to pay. Ultimately, this default, and the subsequent loss of Entrust's customer base, destroyed Entrust's business and drove it into insolvency.

### 5. ERCOT effects a mass transition of Entrust's customers to a provider of last resort.

**a.** Texas law protects the state's electricity customers by providing that they are "entitled . . . to be served by a provider of last resort that offers a [PUCT]-approved standard service package." Tex. Util. Code. § 39.101(b)(4). "In the event that a retail electric provider fails to serve any or all of its customers, the provider of last resort shall offer that customer the standard retail service package for that customer class with no interruption of service to any customer." *Id* § 39.106(g).

The PUCT implements Texas's provider of last resort law through its "Customer Service and Protection Rules." *See* 16 Tex. Admin. Code. § 25.21. These rules provide for a "[m]ass transition of customers" to providers of last resort in the event that a retail electricity provider participating in ERCOT's market defaults and many of its customers must be transferred to new providers all at once. *Id*. §§ 25.43(a), (l), (p)(10). ERCOT, which manages the transition, is afforded state-law immunity "for transitioning or attempting to transition a customer" under the rule. *Id*. § 25.43(o)(2).

**b.** Upon learning that its contract with its supplier had been terminated, Entrust immediately sought to sell off its customer contracts to other retail energy providers, in hopes of maximizing value to its creditors and avoiding sending its customers to providers of last resort. ROA.296. As a result of these efforts, Entrust quickly negotiated, and on March 10, 2021, closed on, a sale of approximately 91,000 commercial and residential customer equivalents and other assets for $3.160 million. ROA.297-298.

On March 3, 2021, Entrust also received a letter of intent from another retail energy provider, JP Energy Resources, LLC, to purchase a significant portion of its remaining customer relationships. ROA.298. Entrust immediately contacted ER-COT and requested a week to close the deal. But, hours later, ERCOT informed Entrust that ERCOT planned to immediately transition Entrust's existing customers to a provider of last resort. ROA.298.

ERCOT dismissed Entrust's requests for ERCOT to reconsider its decision, and Entrust lost its opportunity to consummate the sale. ROA.298. Shortly thereafter, ERCOT transitioned Entrust's remaining customers to a provider of last resort without providing compensation, despite the evident value of those customer relationships. ROA.298.

## C. Procedural Background

**1.** Each of the debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on March 30, 2021. ROA.299. On August 10, 2021, ERCOT filed claims against Entrust in the amount of $296,940,248.94, and against Power of Texas in the amount of $1,453.01. ROA.299. These claims, premised on the debtors' unpaid electricity invoices, make ERCOT the debtors' largest unsecured creditor by a wide margin. ROA.299.

On February 4, 2022, the Trustee of the Entrust Liquidating Trust ("the Trustee") initiated the present adversarial proceeding to challenge ERCOT's proofs of claim. After an initial motion to dismiss was granted in part and denied in part with

opportunity to replead (*see* ROA.560-562), the Trustee filed her Amended Complaint on June 24, 2022. ROA.281-309.

ERCOT again moved to dismiss, invoking abstention under 28 U.S.C. § 1334(c)(1) and *Burford*; the filed rate doctrine; failure to join a required party; and ERCOT's purported sovereign immunity. ERCOT also challenged the legal sufficiency of the Trustee's gross negligence claim and her takings claim. ROA.340-383. Following a hearing on August 31, 2022, the bankruptcy court denied the motion to dismiss with regard to all claims except Count V, the takings claim. ROA.642-646.

**b.** The bankruptcy court certified these issues for a direct appeal and cross-appeal to this Court. This Court granted ERCOT's petition for a direct appeal and the Trustee's petition for a direct cross-appeal on November 18, 2022.

### SUMMARY OF THE ARGUMENT

The bankruptcy court properly denied ERCOT's motion for the court to abstain under *Burford* or to dismiss under a cavalcade of theories.

**I.** As to abstention, ERCOT primarily relies on *ERCOT v. Just Energy Texas, L.P.*, 57 F.4th 241 (5th Cir. 2023), but that case is distinguishable. Unlike there, this litigation involves several factors that make abstention—permissible only in "rare instances" as an exception to the Court's "virtually unflagging obligation to exercise [its] jurisdiction" (*Grace Ranch, L.L.C. v. BP Am. Prod. Co.*, 989 F.3d 301, 313 (5th Cir. 2021))—particularly inappropriate: ERCOT voluntarily availed itself of the bankruptcy proceedings here (*see Ohio Bureau of Emp't Servs. v. Hodory*, 431 U.S. 471, 480 (1977)); the "the delay and expense" of abstaining (*Belloti v. Baird*, 428

U.S. 132, 150 (1976)) would be much greater here than in *Just Energy*; and this case involves damages claims, not merely equitable or discretionary ones, and "an action seeking damages *never* warrants abstention." (*Webb v. B.C. Rogers Poultry, Inc.*, 174 F.3d 697, 701 (5th Cir. 1999) (emphasis added)). The bankruptcy court did not abuse its discretion in declining to abstain.

**II.** The bankruptcy court was also correct that the filed rate doctrine does not bar the Trustee's claims. The reason is simple: The Trustee does not seek to alter or avoid a filed rate; rather, she seeks to *enforce* the *actual* filed rate, from which ER-COT unlawfully departed. As numerous courts have held, the filed rate doctrine does not bar challenges of this nature.

**III.** The bankruptcy court was further correct that the PUCT is not a necessary party to this dispute, much less an indispensable one whose absence requires dismissal. The PUCT has no direct interest in this action, which does not seek to recover anything from the PUCT nor bind the agency in any respect. Fed. R. Civ. P. 19(a)(1)(B). Indeed, the Trustee's complaint takes the validity of the PUCT's orders as a given, and challenges ERCOT's faulty interpretation of, and departure from, those orders. Given these features and others, the bankruptcy court also did not abuse its discretion in its highly context-specific determination that the case could go on without the PUCT, even if it *were* a necessary party. Fed. R. Civ. P. 19(b).

**IV.** ERCOT is not entitled to sovereign immunity, as the bankruptcy court correctly concluded. *First*, ERCOT is a private entity, and it does not act as an arm of the state under well-settled Eleventh Amendment principles—the "most

significant" factor, for example, cuts strongly against immunity because "a judgment against" ERCOT will not "be paid with state funds." *Bonin v. Sabine River Auth.*, 65 F.4th 249, 254 (5th Cir. 2023). And *second*, ERCOT has plainly waived whatever immunity it might have had: The Bankruptcy Code explicitly provides that by filing a proof of claim, an entity waives sovereign immunity as to claims arising "out of the same transaction or occurrence" (11 U.S.C. § 106(b)), which describes the Trustee's lawsuit here.

**V.** The Trustee also pleads a legally cognizable duty sufficient to state a gross negligence claim, again as the bankruptcy court concluded. The vulnerability of Texas's power grid to a severe winter storm was well known to ERCOT, as was the likelihood of an imminent severe weather event. Under Texas law, such foreseeability is the very heart of legal duty. And Texas statutes and regulations further establish ERCOT's responsibility to "ensure the reliability and adequacy of the regional electrical network" (Tex. Util. Code § 39.151(a)(2)), creating an enforceable tort duty.

**VI.** Though the bankruptcy court got much correct, it was wrong to dismiss the Trustee's Fifth Amendment takings claim because it believed the claim was "inconsistent" with the Trustee's position that ERCOT lacks sovereign immunity. ROA.644. Inconsistency of legal theories in a complaint is no basis for dismissal. *See Fredonia Broad. Corp. v. RCA Corp.*, 481 F.2d 781, 790 (5th Cir. 1973). In any event, the claims are not inconsistent. Under the entirely different doctrinal framework governing state action for constitutional claims under Section 1983, ERCOT "has been delegated a public function by the State" (*Brentwood Acad. v. Tenn.*

15

*Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)), and its exercise of that delegated public function is therefore amenable to constitutional attack.

**ARGUMENT**

The bankruptcy court correctly rejected each item on the laundry list of objections ERCOT now presses on appeal. Its order should be affirmed in major part but reversed as to the takings claim.

## I.      ABSTENTION IS NOT WARRANTED

ERCOT first argues that the bankruptcy court should have abstained under *Burford v. Sun Oil Co*, 319 U.S. 315 (1943), which provides generally for federal-court "abstention on grounds of comity with the States where the exercise of jurisdiction by the federal court would disrupt a state administrative process." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 725 (1996) (quotation marks omitted). Specifically, ERCOT heavily relies on this Court's recent decision in *Just Energy*, 57 F.4th 241, which reversed the non-abstention decision of another bankruptcy court addressing the fallout from Winter Storm Uri.

But this case is different from *Just Energy* in multiple respects critical to both the purposes and the application of the abstention doctrine. With these differences in mind, the bankruptcy court did not abuse its discretion in declining to abstain. *See, e.g.*, *Stratta v. Roe*, 961 F.3d 340, 356 (5th Cir. 2020) (this Court "review[s] an abstention ruling for abuse of discretion, but . . . review[s] de novo whether the requirements of a particular abstention doctrine are satisfied.").

### A.      *Just Energy* does not control this case.

To sustain its *Burford* abstention argument, ERCOT repeatedly asserts that this case is on all fours with the Court's recent decision in *Just Energy*. *See generally*

Br. 25-35. True enough, both cases concern bankruptcy proceedings arising from extreme electricity costs during Winter Storm Uri. But that is where the similarities end.

**1.** First, unlike in *Just Energy*, here ERCOT voluntarily entered the fray of federal litigation by filing a claim—for nearly $300 million—in Entrust's ongoing bankruptcy proceeding. ERCOT's willful availment of a federal forum cuts sharply against abstention under any recognized theory.

Where a "State voluntarily chooses to submit to a federal forum, principles of comity do not demand that the federal court force the case back into the State's own system." *Hodory*, 431 U.S. at 480 (explaining circumstances in which a federal court is not "compelled to abstain"); *accord Daves v. Dallas County*, 22 F.4th 522, 545 (5th Cir. 2022) (same, quoting *Hodory*); *see S. Cal. Edison Co. v. Lynch*, 307 F.3d 794, 806 (9th Cir. 2002) (where the state has "voluntarily submit[ted] to federal jurisdiction," "the threshold requirements for the exercise of *Burford* abstention by the district court have not been satisfied") (quotation marks omitted).

Here, ERCOT has voluntarily chosen a federal forum by filing proofs of claim totaling nearly $300 million in the bankruptcy court, alleging that the debtors underpaid it for electricity purchased during Winter Storm Uri. ROA.299. It was only after ERCOT voluntarily entered the bankruptcy proceedings that the Trustee filed the

adversary complaint, which sought first and foremost to "[d]isallow[], in part, and reduc[e] the ERCOT Claim." ROA.308.

The circumstances were markedly different in *Just Energy*. There, the bankrupt generator first "paid ERCOT the monies owed," then disputed a specific sum. *Just Energy*, 57 F.4th at 246. Because ERCOT had been paid, it was not a creditor in Just Energy's bankruptcy. It was thus not involved in federal proceedings *at all* until Just Energy haled it into court.

This distinction is critical for a court sitting in equity. Because abstention doctrines are "not exceptions to the federal courts' jurisdiction, but are rather judicially created guidelines defining circumstances in which courts may decline to exercise jurisdiction" (*Am. Bank & Tr. Co. of Opelousas v. Dent*, 982 F.2d 917, 921 (5th Cir. 1993)), this Court has explained that that "a federal court should abstain from deciding actions" only when "considerations of comity and federalism . . . so dictate" (*Evanston Ins. Co. v. Jimco, Inc.*, 844 F.2d 1185, 1189 (5th Cir. 1988)). Where ERCOT has "voluntarily" entered federal proceedings, those same "principles of comity" do not demand abstention. *Hodory*, 431 U.S. at 480. This Court has thus not hesitated to preclude abstention where a state "has chosen a federal forum because it . . . wishes to avoid lengthy and protracted state . . . proceedings." *Felder v. Estelle*, 693 F.2d 549, 554 (5th Cir. 1982).

Just so here: Having itself invoked the jurisdiction of the bankruptcy court by seeking nearly $300 million from the debtors, ERCOT will not now be heard to argue that the Trustee's adversary proceeding—the bankruptcy court's mechanism for determining the true value of ERCOT's claims against the bankruptcy estate—must be dismissed under abstention doctrines based in federal-state comity.

**2.** Second, "[a]ny consideration of abstention," including under *Burford*, "must take into primary account its effects on the rights sought to be protected in the court asked to stay its hand." *Ross v. Houston Indep. Sch. Dist.*, 559 F.2d 937, 942 (5th Cir. 1977). Accordingly, the Supreme Court has long counseled that courts weighing abstention must account for the "the delay and expense to which application of the abstention doctrine inevitably gives rise." *Belloti*, 428 U.S. at 150. Abstention may be well-justified when a federal court can defer to state fora equipped to provide speedy remedies, yet be unwarranted when all it would accomplish is putting meritorious claims on ice. *See Duncan v. Poythress*, 657 F.2d 691, 697 (5th Cir. 1981) (because "abstention entails piecemeal litigation and the resulting delay," courts weighing abstention must conduct a "broad inquiry" that considers "the rights at stake and the costs of delay pending state court adjudication").

The costs of abstention are much greater in this case than they were in *Just Energy*. Here, ERCOT is by far the debtors' largest unsecured creditor. ROA.299. But it is also only one creditor among dozens of others, who collectively assert very substantial claims. Abstaining in this litigation would thus grind the entire

20

bankruptcy proceeding to a halt, tying up *all* the debtors' unsecured creditors from receiving their *pro rata* share of the debtors' assets. Abstention here thus gives rise to harmful delay that frustrates the very purpose of bankruptcy law: "to secure prompt, effective administration and settlement of all debtor's assets and liabilities within a limited time." *In re United Operating, LLC*, 540 F.3d 351, 355 (5th Cir. 2008) (quotation marks omitted).

To be sure, the *Just Energy* court also noted that "the bankruptcy proceedings cannot move forward" until a given question of state law had been resolved. 57 F.4th at 254 n.11. However, that case came to the Court in a much different posture than this one. Just Energy had already paid off its debt to ERCOT as part of its Canadian bankruptcy proceedings. It filed for Chapter 15 bankruptcy in the United States specifically to recover payments it felt were unjustified. But abstention in that circumstance would not risk tying up the bankruptcy. Indeed, just a few months after the Court's decision in *Just Energy*, the debtors in that litigation have moved to close their Chapter 15 proceedings entirely. *See* Final Report and Motion, *In Re: Just Energy Group Inc.,* No. 21-30823 (Bankr. S.D. Tex. April 20, 2023).

**3.** Finally, "[f]ederal courts have the power to dismiss or remand cases based on abstention principles only where the relief being sought is equitable or otherwise discretionary." *Quackenbush*, 517 U.S. at 731. By contrast, it would be "an unwarranted application of the *Burford* doctrine" to dismiss or remand "a damages action." *Id.*

21

Applying *Quackenbush*, this Court has confirmed that "an action seeking damages *never* warrants abstention." *Webb*, 174 F.3d at 701 (emphasis added). Thus, for instance, though "Courts frequently refer to *quantum meruit* as an equitable doctrine and even as seeking equitable relief," at bottom, "*quantum meruit* is an action at law—a legal cause of action seeking money damages." *Id*. at 704. In such a case, a "court lacks discretion to balance interests between the state and federal governments," as "[r]elief turns not on a weighing of the equities but on a straightforward application of law to facts." *Id*. at 705. Accordingly, "[i]f the facts justify relief under the legal standard . . . the court has no discretion to weigh the equities and decide against relief." *Id*. In those instances, "[t]he state's interests must yield to the federal court's 'strict duty to exercise the jurisdiction that is conferred upon [it] by Congress.'" *Id*. (quoting *Quackenbush*, 517 U.S. at 716).

In this action, the Trustee's complaint asserts two counts that are unambiguously damages actions: Count V, the takings claim on cross-appeal, and Count VI, the gross negligence claim. ROA.306-308; *see City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 711 (1999) ("[A] § 1983 action seeking redress for an uncompensated taking . . . [is] an action at law."); *Anderson v. United States*, 520 F.2d 1027, 1029 (5th Cir. 1975) ("[I]t is clear that the underlying negligence action is one at law."). Because the Trustee seeks non-discretionary relief in the form of damages through these claims, she calls upon the bankruptcy court to make a "straightforward application of law to facts" along well-worn constitutional and common-law causes of action, precluding abstention. *Webb*, 174 F. 3d at 705.

Ultimately, because the Trustee seeks damages in this action, abstention is unavailable across the board. *Cf. Saloom v. Texas Dep't of Fam. & Child Protective Servs.,* 578 F. App'x 426, 429 (5th Cir. 2014) (finding *Younger* abstention unavailable in a case seeking both damages and discretionary relief on account of the damages claims). Furthermore, similar to the *quantum meruit* claims in *Webb*, while the Trustee's claim objections may seem "superficially" "equitable [in] nature" in light of the generally equitable character of bankruptcy objections, they too call for the "straightforward application of law to facts." *Webb*, 174 F.3d at 703, 705. Specifically, the claim objections seek to reduce the outstanding balance of the debtors' electricity invoices to the amount the debtors should have owed if ERCOT had applied its pricing protocols properly, as legally and contractually required.

The Trustee's damages claims thus also present additional grounds to distinguish *Just Energy*. There, three of the counts were for declaratory judgment (*see* 57 F.4th at 241), which the Court in *Quackenbush* recognized as a quintessentially discretionary remedy amenable to abstention. 517 U.S. at 718-719. And the fourth count was for a turnover action under 11 U.S.C. § 542 (*see* 57 F.4th at 241), which courts have also recognized as an equitable remedy. *See, e.g.*, *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 337 (3d Cir. 2004) ("[T]urnover claims are equitable in nature."); *Braunstein v. McCabe,* 571 F.3d 108, 122 (1st Cir. 2009) (similar).

\* \* \*

As the Supreme Court has explained, "the power to dismiss or remand a case under the abstention doctrines" is a function "of the discretion federal courts have

traditionally exercised in deciding whether to provide equitable or discretionary relief." *Quackenbush*, 517 U.S. at 730. Thus, like other equitable doctrines, "the equitable practice of abstention is limited" by fact-bound considerations like hardship to the parties and the public interest. *Belloti*, 428 U.S. at 150. The differences between *Just Energy* and this case are more than enough for a court exercising its discretion to come out differently here than it would in the prior case, despite their surface-level similarities.[5]

**B.    The *Burford* factors do not favor abstention.**

The foregoing demonstrates why abstention of any kind, including under *Burford*, is categorically inappropriate in this case. Nonetheless, a brief analysis of the *Burford* factors further underscores the differences between this case and *Just Energy*.

**1.** ERCOT claims that because several counts in the complaint touch on state law, the first *Burford* factor favors abstention. Br. 26.

---

[5] A panel of this court is bound to apply *Just Energy*, and, as we have shown, may easily do so while finding the case distinguishable and abstention inappropriate. Nonetheless, we also note that *Just Energy's* holding that *Burford* abstention applies to bankruptcy cases *at all* sits uneasily with the bankruptcy code's specific provisions of statutory abstention. *See* 28 U.S.C. § 1334(c); 11 U.S.C. § 305(a), (c). Ordinarily, when a statute creates a remedy comparable to one traditionally found in equity, the statute replaces, rather than supplements, the equitable principle. *See, e.g.*, *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 677-679 (2014) (Copyright Act's statute of limitations subsumes the equitable defense of laches). Entrust therefore preserves for potential future review the argument that *Just Energy* was wrongly decided in this respect.

Not so. All but one of these state-law claims arise under the bankruptcy code and thus continue to revolve around quintessentially federal interests. *Cf. Matter of Dierschke*, 975 F.2d 181, 185 (5th Cir. 1992) (bankruptcy proceedings are "uniquely federal"). Indeed, the only purely state-law claim is the gross negligence claim, which, as described above, is a legal claim for damages that forecloses abstention.

**2.** Unlike the claims in *Just Energy*, which largely focused on the validity of the PUCT's orders under principles of state administrative law, the Trustee's claims do not call on the bankruptcy court to partake in an "open-ended 'fairness' inquiry into predominantly local matters" or "second guess the policy decisions of state regulators." *Grace Ranch*, 989 F.3d at 316. Nor does any of the relief sought "affect the State's ability to bring future suits." *Id* at 315. Rather, the Trustee advances comparatively modest claims about the disjuncture between the Protocols and ERCOT's decisions during the storm—questions much more rooted in basic principles of contract and statutory interpretation and not dense and inherently partisan issues of state policy. There is no "skein of state law that must be untangled" to reach the federal issues here. *Just Energy,* 57 F.4th at 250.

**3.** Likewise, the trustee's claims do not raise the specter of "worrisome meddling" (*Grace Ranch*, 989 F.3d at 317), or portend "recurring and confusing federal intervention in an ongoing state scheme" (*Wilson v. Valley Elec. Membership Corp.*, 8 F.3d 311, 315 (5th Cir. 1993)).

In *Just Energy*, the debtors sought to force ERCOT to "repay monies for the energy Just Energy expended," which would force ERCOT to "allocate the debt

owed to other market participants." 57 F.4th at 253. Here, by contrast, the Trustee is trying to reduce Entrust's debt obligation to its proper level, not extract money back from ERCOT. There is therefore no risk of other participants in the market paying the price—indeed, any generators of electricity who may have been injured because Entrust could not pay its invoice have already been made whole through a "Debt Obligation Order" entered by the PUCT on October 14, 2021. ROA.299.

**4.** Finally, though state law does make alternative forums available, it bears repeating that ERCOT chose to proceed against the debtors in federal bankruptcy court. *See* pages 18-20, *supra*. ERCOT cannot simultaneously seek recovery in bankruptcy yet cry foul at the bankruptcy court's mechanisms for assessing the proper amount of that recovery.

\* \* \*

At bottom, this case is not one of "the rare instances when hearing a case within [the court's] equity jurisdiction would 'be prejudicial to the public interest.'" *Grace Ranch*, 989 F.3d at 313 (quoting *Burford*, 319 U.S. at 318). The dispositive differences between this case and *Just Energy*, the application of the *Burford* factors, and the fact that "*Burford* abstention is disfavored as an abdication of federal jurisdiction" (*id.* at 314) all confirm that the bankruptcy court did not abuse its discretion in declining to abstain.

## II. THE FILED RATE DOCTRINE DOES NOT BAR THE TRUSTEE'S CLAIMS.

The bankruptcy court also correctly concluded that the Trustee's claim objections do not implicate the filed rate doctrine. *See* ROA.643. This Court reviews that determination de novo. *Texas Com. Energy v. TXU Energy, Inc.*, 413 F.3d 503, 507 (5th Cir. 2005) ("*TCE*").

### A. The Trustee's claim objections do not challenge a filed rate authorized by the PUCT.

ERCOT's argument (at 35-42) that the Trustee's claim objections (which it erroneously labels "pricing claims") must be dismissed under the filed rate doctrine falters for the simple reason that the Trustee does not challenge a filed rate approved by the PUCT. Rather, the rates ERCOT charged directly contradicted the ERCOT protocols applicable at the time and were not otherwise authorized by the PUCT orders. The Trustee seeks to enforce the filed rate, not avoid it.

**1.** The filed rate doctrine is rooted in "preservation of [regulators'] primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the [regulator] has been made cognizant." *Arkansas-Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577-578 (1981). The doctrine thus establishes that prices approved by a regulator are "*per se* reasonable" because regulators, not courts, are in the best position to assess the fairness of utility prices. *TCE*, 413 F.3d at 508.

Because the watchword of the filed rate doctrine is adherence to the rates approved by regulators, the doctrine imposes reciprocal obligations on utilities and

27

ratepayers alike. "No regulated [utility] may *collect* a rate other than the one filed" (*Louisiana Land & Expl. Co. v. Amoco Prod. Co.*, 878 F.2d 852, 855 (5th Cir. 1989)), and ratepayers, in turn, may not seek "judicial recourse against a regulated entity based upon allegations that the entity's 'filed rate' is too high, unfair or unlawful" (*TCE*, 413 F.3d at 507).

Accordingly, since "utilities [must] adhere to the filed rate" (*Louisiana Pub. Serv. Comm'n v. FERC*, 771 F.3d 903, 911 (5th Cir. 2014)), numerous courts have agreed that the filed rate doctrine does not preclude court challenges alleging that the utility has deviated from or misapplied that rate.[6]

In fact, the doctrine "*forbids* a regulated entity [from] charg[ing] rates for its services other than those properly filed." *Hall*, 453 U.S. at 577 (emphasis added).

---

[6] *See, e.g., Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1172 (9th Cir. 2002) (claim that a fee was unauthorized "and that the fee therefore violated the tariff" was "not precluded by the filed-rate doctrine"); *Drew v. MCI Worldcom Mgmt. Co., Inc.*, 1999 WL 1087470, at *1 (N.D. Tex. Dec. 1, 1999) ("Drew is not attempting by his suit to challenge MCI's filed tariff. Indeed, he is attempting to enforce the tariff as filed."); *Occidental Chem. Corp. v. Louisiana Pub. Serv. Comm'n*, 494 F. Supp. 2d 401, 417 (M.D. La. 2007) (filed rate doctrine does not prohibit a court from applying a pre-existing filed rate if the new contested rate is unlawful); *Black Radio Network, Inc. v. NYNEX Corp.*, 44 F. Supp. 2d 565, 574 (S.D.N.Y. 1999) (claims "that defendants failed to comply with the terms of the tariff" "do not implicate … the filed rate doctrine."); *Randleman v. Fid. Nat. Title Ins. Co.*, 465 F. Supp. 2d 812, 823 (N.D. Ohio 2006) ("Plaintiffs are not challenging the reasonableness of the filed rate, but instead attempt to enforce a contract incorporating a filed rate."); *N. Valley Commc'ns, LLC v. MCI Commc'ns Servs., Inc.*, 2008 WL 2627519, at *3 (D.S.D. June 26, 2008) ("[A]llegations [of misbilling] are not barred by the filed rate doctrine.").

Thus, in *Hall* the Supreme Court held that the doctrine barred state courts from "award[ing] as damages a rate never filed with the [regulator] and thus never found to be reasonable" under applicable law. *Id*. at 579. The filed rate doctrine is therefore no categorical bar to lawsuits—including adversary proceedings before a bankruptcy court—premised on the utility exceeding or misapplying its filed rate.

**2.** Here, ERCOT cannot invoke the filed rate doctrine to dismiss the Trustee's claim objections because the complaint alleges that ERCOT charged rates well in excess of those authorized by the PUCT. The Trustee's claim objections therefore do not challenge the filed rate but, to the contrary, seek to have it enforced.

**a.** The complaint alleges that ERCOT's charges flatly contradicted ERCOT's applicable rate-setting protocols. At the outset of Winter Storm Uri—as the storm's demands on the power grid increased scarcity—electricity costs also increased, occasionally approaching, but never reaching, the $9,000/MWh HCAP level. ROA.290. That was by design: ERCOT's rate-setting protocols employed "Reliability Deployment Price Adders" that would increase the market price of electricity in response to scarcity conditions.

Crucially, however, ERCOT's market rate protocols that were then in effect excluded firm load shed from its list of Reliability Deployment Price Adders. ROA.286-287, ROA.301. In other words, ERCOT's rate-setting protocols—the basis of its market rates as regulated by the PUCT and thus its filed rates—did not allow ERCOT to increase prices in response to firm load shed. Certainly, the protocol did not allow ERCOT to peg prices at the HCAP level on account of firm load

shed for the duration of the storm and its aftermath, as ERCOT went on to do. ROA.290-291.

ERCOT's protocols spelled out the procedures necessary to revise them, including under urgent circumstances like Winter Storm Uri. ROA.292. But rather than comply with such procedures to lawfully revise its protocols, ERCOT simply disregarded them and began considering firm load shed as one of its Reliability Deployment Price Adders—a flagrant breach of the protocols as they stood at that time. ROA.292-293. It was only once ERCOT strayed from its protocols in this manner that market prices reached the $9,000/MWh HCAP level. ROA.293. This electricity price was thus not a filed rate but the product of ERCOT's manipulation of prices to reach the maximum level by ignoring its rate-setting protocols.

Worse, ERCOT's manipulation escalated as the storm subsided. On the evening of February 17, in response to dwindling firm load shed in the market, ERCOT began inflating the firm load shed reported in the Reliability Deployment Price Adder, imposing a static value of 20,000 MWs of firm load shed—more than double the firm load shed existing in the market at that time. ROA.293-294. ERCOT simultaneously informed the market that "[o]nce ERCOT is no longer instructing firm Load shed, the adjustment [to the Reliability Deployment Price Adder] will be set to 0." ROA.293-294. In reality, ERCOT continued to manipulate the firm load shed indicated in the Reliability Deployment Price Adder for 33 hours after firm load shed had subsided from the market. ROA.294.

At bottom, ERCOT's charges of $9,000/MWh were not the product of the protocols ERCOT created to inform market participants and the PUCT about what market prices would be. That price was thus not the filed rate but rather the product of market manipulation and arbitrary, impermissible *ad hoc* changes to the protocols intentionally designed to inflate prices beyond those produced by the protocols. The filed rate doctrine thus does not protect ERCOT's efforts to exceed the rates set out in those protocols.

**b.** The facts alleged by the Trustee also belie any suggestion that ERCOT's prolonged $9,000/MWh charges were sanctioned by the PUCT orders. To be sure, the PUCT's first order, issued on February 15 following a mere six minutes of deliberation, contained a vague statement "direct[ing] ERCOT to ensure that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals." ROA.290-291. However, as the PUCT has since acknowledged, this order "provided no further instructions to ERCOT about what adjustments should be made or how ERCOT should make them," and that its order was not a "self-executing statement[] applicable to market participants that 'electricity will be automatically priced at the $9,000 system-wide offer cap.'" ROA.291 (quoting *Luminant* Br. 9, 24).

In other words, particularly on a motion to dismiss, it is impossible to infer from the PUCT's orders any endorsement of ERCOT's decision to defy its protocols by pricing in firm load shed without properly revising those protocols first.

Beyond that, the PUCT's instruction to "account[]" for firm load shed "in ERCOT's scarcity pricing signals" plainly cannot support ERCOT's actions on

February 17 to impose a static firm load shed price adjustment of 20,000 MW when actual firm load shed was half that. And the PUCT's orders certainly could not justify ERCOT continuing to apply the $9,000/MWh price for 33 hours after firm load shed had subsided *entirely*, despite ERCOT promising market participants that it would stop applying the firm load shed price adjustment as soon as firm load shed ended.

Far from sanctioning ERCOT's actions, the PUCT's Independent Market Monitor, the official within the regulatory agency charged with "[d]etect[ing] and prevent[ing] market manipulation strategies and market power abuses," condemned ERCOT's actions. ROA.294 (quoting 16 Tex. Admin. Code § 25.365(c)(1)). The Independent Market Monitor remarked that ERCOT had engaged in "inappropriate pricing intervention" that "resulted in $16 billion in additional costs to ERCOT's market" for the 33 hours during which ERCOT charged $9,000/MWh despite there being no firm load shed. ROA.294.

In short, far from being expressly or tacitly approved by the regulator, ERCOT's rates were decried by it. The Trustee's claim objections are therefore not barred by the filed rate doctrine, as they do not challenge a filed rate.[7]

---

[7] ERCOT misleadingly suggests (at 39) that this Court's decision in "*TCE* controls this case," including for the proposition that "claim[s] against ERCOT based on 'ERCOT's [alleged] failure to follow its own protocols'" are barred by the filed rate doctrine. *Id*. (quoting *Tex. Com. Energy v. TXU Energy, Inc.*, 2004 WL 1777597, at *17 (S.D. Tex. June 24, 2004). But, as ERCOT admits, that quote is from the *district* court's opinion in *TCE*, and the issue was not involved in the subsequent appeal.

**3.** Apparently recognizing that the rates ERCOT charged directly contradicted its governing protocols and were not authorized by the PUCT orders, ERCOT falls back on the blanket assertion that "the price charged by ERCOT in the wholesale market constitutes a filed rate based on the PUCT's broad oversight authority." Br. 38. In other words, ERCOT asserts that under this Court's decision in *TCE*, the mere *existence* of a regulator means that anything goes.

This is a vast overreading of *TCE*. *TCE* simply stands for the proposition that the "PUCT's oversight over the market" is sufficient to make market-based rates charged by a utility "filed rates," whether or not they are formally filed with the PUCT. 413 F.3d at 510. Because the PUCT is charged with "ensur[ing] 'safe, reliable, and reasonably priced electricity,'" which it accomplishes by "requir[ing] [utilities] to file detailed information to assess market power," the market rates that ERCOT charges based on its protocols are presumptively approved by the PUCT and thus constitute filed rates. *Id*. at 509 (quoting Tex. Util. Code §§ 39.101(a)(1), 35.004(e)).

It does not follow that rates *improperly* calculated and applied by *abandoning* the market protocols deserve the same protection. To the contrary, when, as here, the regulator's participation in the electricity market largely involves monitoring market prices as determined by the utility's protocols and its communication with market participants, it is all the more important that the utility follow those protocols and honor those commitments.

**4.** At the very least, the Trustee's claim objections are indisputably proper insofar as they challenge ERCOT's application of the $9,000/MWh HCAP price for 33 hours after all firm load shed had ended. As described above, even if ERCOT's protocols allowed it to adjust prices to account for firm load shed and the PUCT orders approved ERCOT doing so, that would still not explain why ERCOT continued to charge the maximum price for 33 hours after there was no more firm load shed. Even the most charitable reading of ERCOT's protocols and the PUCT orders could not support $9,000/MWh as a market-based filed rate once there was no more firm load shed, since ERCOT's price adjustment was expressly conditioned on firm load shed.

### B. The Trustee's claim objections request relief well within the bankruptcy court's province.

ERCOT wrongly insists that the Trustee "seek[s] a judicial determination of a different fair value of the rate charged," supplanting the bankruptcy court's wisdom for the regulator's and imposing a "discriminatory rate." Br. 39, 40. To the contrary, the Trustee merely asked the bankruptcy court to enforce the *actual* filed rate, which binds ERCOT every bit as much as its market participants.[8]

---

[8] *See, e.g.,* ROA.302 ("[T]he Trustee thus seeks an order . . . disallowing the ERCOT Claim to the extent that the asserted amount exceeds the amount properly calculated under the SFA and the Protocols in effect during Winter Storm Uri") (Count I); ROA.304 ("The ERCOT Claim is based on a miscalculation by ERCOT") (Count III); ROA.306 (ERCOT's claim "exceeds the reasonably equivalent value in exchange for what the Debtors received" due to the mismatch between the price according to the protocols and the charged price).

Because determining the proper rate is a simple task of applying ERCOT's protocols as they existed during Winter Storm Uri—that is, the *actual* filed rate—the bankruptcy court need not intrude upon the PUCT's regulatory domain to determine the proper amount of ERCOT's unsecured claim against the debtors. Indeed, an economic analysis has already demonstrated that applying ERCOT's protocols as written during the relevant time period would produce an average rate of $2,404/MWh. ROA.295 (citing London Economics International, Analysis of ERCOT Market Prices During February 2021 Winter Storm Event at 4 (May 28, 2021), https://perma.cc/L8AX-N95Y). Moreover, the analysis concluded that unwinding ERCOT's unauthorized rate charges and applying the proper filed rate found within its protocols was a "straightforward matter." ROA.295.

Accordingly, ERCOT's complaint that the Trustee's claim objections would yield "discriminatory" rates rings hollow. Br. 39. To the contrary, the Trustee seeks only to have ERCOT's true filed rates be applied to the debtors. Such a rate is easily ascertainable by courts and capable of uniform application to any ERCOT customer that was wrongly overcharged during Winter Storm Uri.

## III. THE PUCT IS NOT A REQUIRED PARTY.

Next, the bankruptcy court was correct when it concluded, the first time ERCOT tried to raise the argument, that "under no circumstances is the PUCT a necessary party" to this action. ROA.547. *Accord* RO.644 ("This is simply a proof of claim filed by ERCOT. They seek payment from the Debtor. It doesn't implicate the PUCT at all.").

As this Court has explained, "[d]etermining whether an entity is an indispensable party is a highly-practical, fact-based endeavor, and '[Rule] 19's emphasis on a careful examination of the facts means that a district court will ordinarily be in a better position to make a Rule 19 decision than a circuit court would be.'" *Hood ex rel. Mississippi v. City of Memphis*, 570 F.3d 625, 628 (5th Cir. 2009) (quoting *Pulitzer–Polster v. Pulitzer*, 784 F.2d 1305, 1309 (5th Cir.2006)). Accordingly, this Court "review[s] the [bankruptcy] court's decision to dismiss for failure to join an indispensable party for an abuse of discretion." *Id*.

ERCOT's claim that the PUCT is necessary to this action remains meritless, as the bankruptcy court held. The PUCT has no interest at stake in this litigation, and ERCOT runs no risk of incurring inconsistent obligations. And even if the PUCT were a necessary party under the federal rules, it is clearly not an *indispensable* one.

### A.    The PUCT is not a necessary party.

Rule 19(a)(1)(B) defines a required party as:

A person who . . . claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

> (i) as a practical matter impair or impede the person's ability to protect the interest; or

> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Neither option is satisfied here.

**1.** First, the PUCT has no interest in this litigation, and thus its absence in no way impairs its ability to protect itself and its prerogatives. The only parties with a stake in this litigation are already joined to it: the debtors' unsecured creditors, represented by the Trustee, and ERCOT, whose proofs of claim are at issue. The lawsuit concerns the actions of ERCOT alone, and ERCOT alone will be bound by a judgment in the Trustee's favor.

ERCOT insists that the PUCT is necessary to this action because the Trustee challenges the "applicability of the PUCT Orders" and would thereby "eliminate the PUCT's power to 'otherwise direct' the price of electricity in the ERCOT market." Br. 45 (quoting 16 Tex. Admin. Code § 25.501(a)). That argument is contradicted by the Trustee's complaint, which in no way questions the validity or applicability of the PUCT's orders. Rather, the Trustee attacks ERCOT's *interpretation* of those orders, which read into them a nonexistent directive to peg market prices for electricity at the maximum rate for several days. *See, e.g.*, ROA.291.

Thus, while ERCOT repeatedly cites provisions of Texas law providing that a "state agency must be a party to any action challenging the 'validity or applicability' of its rules" (Br. 44 (citing Tex. Gov't Code § 2001.038(a), (c))), those provisions have no bearing on this federal bankruptcy proceeding, which does not call into question the PUCT's rules or orders. *See also id.* at 46 (advancing additional argument sharing the fundamentally false premise that the Trustee contests "the PUCT Orders' validity or applicability"). In short, nothing in this case implicates a

"direct, substantial, and legally protectable interest" held by the PUCT, and it is therefore not a necessary party. *Saldano v. Roach*, 363 F.3d 545, 556 (5th Cir. 2004).

**2.** Nor do the Trustee's claims threaten to "leave an existing party"—*i.e.*, ERCOT—"subject to a substantial risk of incurring . . . inconsistent obligations." Fed. R. Civ. P. 19(a)(1)(B)(ii). The Trustee's claims relate solely to ERCOT's proofs of claim in *this* bankruptcy proceeding. All that is at stake is how much, if anything, the debtors still owe ERCOT, and thus no decision by the bankruptcy court could compel ERCOT to violate any obligation to its other customers or defy any other court order related to Winter Storm Uri. *See Broad. Music, Inc. v. Armstrong*, 2013 WL 3874082, at *7 (W.D. Tex. July 24, 2013) ("Inconsistent obligations occur when an existing party cannot comply with one court's order without breaching the order of another court that pertains to the same incident.").

Nonetheless, ERCOT suggests without elaboration that this "adversary proceeding [could] culminat[e] in a judgment that is inconsistent" with the PUCT orders. Br. 47 That makes no sense—the Trustee's claims are premised on the argument that *ERCOT*'s activity during Winter Storm Uri was inconsistent with the PUCT orders. A judgment in the Trustee's favor would cure that inconsistency, not create a new one. ERCOT also points to several "pending state court actions to which the PUCT is a party" that concern the PUCT orders. But *ERCOT* is not a party to those lawsuits, and thus faces no risk of incurring obligations inconsistent with the outcome here.

* * *

At bottom, this is an adversary proceeding in a bankruptcy case arising out of ERCOT's own proofs of claim filed against the debtors. The PUCT has nothing to gain or lose from the lawsuit; it will not be bound by any judgment; and none of its orders or regulatory actions will be invalidated or even called into question. It has no interests to represent, and certainly none that differ from the interests that ERCOT has already "vigorously addressed" during this litigation. *Fed. Ins. Co. v. Singing River Health Sys.*, 850 F.3d 187, 201 (5th Cir. 2017). And ERCOT itself will suffer no new obligations from the bankruptcy court's order that would collide with its obligations to any other party.

### B.    The PUCT is not an indispensable party.

Even if the PUCT were a necessary party, the district court would have been well within its discretion to sustain the lawsuit without joining the PUCT. Rule 19(b) provides that "[i[f a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." The question "[w]hether a person is 'indispensable,'" such that "a particular lawsuit must be dismissed in the absence of that person, can only be determined in the context of particular litigation" and defies any "prescribed formula." *Provident Tradesmens Bank & Tr. Co. v. Patterson*, 390 U.S. 102, 118 & n.14 (1968).

**1.** As a threshold matter, ERCOT wrongly suggests that the PUCT's sovereign immunity resolves this question, making the PUCT indispensable because it "cannot enter the scrum without waiving its immunity." Br. 47-48 (quoting *Lee v. Anthony*

*Lawrence Collection, L.L.C.*, 47 F.4th 262, 267 (5th Cir. 2022)). While the court in *Lee* did remark that a party's enjoyment of sovereign immunity may sometimes leave "very little room for balancing of other factors set out in Rule 19(b)," the court's opinion did not upset the highly context-dependent nature of the inquiry; to the contrary, the court proceeded to apply the Rule 19(b) factors rather than rest on the absent required party's sovereign immunity alone. *Id.* at 268.

The same analysis is compelled here. The PUCT's purported sovereign immunity notwithstanding, the "Supreme Court's reminder that the Rule 19(b) determination is context-sensitive[] and does not hinge on formulaic characterizations" is inexorable. *Moss v. Princip*, 913 F.3d 508, 518 n.46 (5th Cir. 2019). The factors under Rule 19(b) thus remain meaningful "guides to the overarching 'equity and good conscience' determination," allowing "[p]ragmatic and equitable considerations [to] control." *Whalen v. Carter*, 954 F.2d 1087, 1096 (5th Cir. 1992).

**2.** Applying the Rule 19(b) factors, the bankruptcy court's decision to allow the Trustee's claims to move forward against ERCOT alone was well-founded, and certainly was no abuse of discretion.

*First*, as already discussed, there is no risk that a judgment in this case "might prejudice" the PUCT's interests (Fed. R. Civ. P. 19(b)(1)), because the Trustee's claims do not seek to alter or challenge any PUCT order or policy, or to bind the PUCT in any way. *See* pages 37-38, *supra.* Likewise, ERCOT would not be prejudiced by the PUCT's absence because it faces no risk of incurring inconsistent obligations. *Id.*

*Second*, even if any risk of prejudice existed, it could easily "be lessened or avoided" by the bankruptcy court "shaping the relief" to protect the PUCT's interests and limiting its impact to ERCOT. Fed. R. Civ. P. 19(b)(2). Again, the Trustee's claims are already limited to ERCOT alone and have no bearing on the PUCT. Obviously, the bankruptcy court is capable of fashioning relief that leaves the PUCT unharmed—it need do nothing but grant the relief the Trustee has requested.

*Third*, "a judgment rendered in [the PUCT's] absence would be adequate" to resolve the dispute between ERCOT and the Trustee. Fed. R. Civ. P. 19(b)(3). All the Trustee seeks is a correction to the amount asserted in ERCOT's proofs of claim to reflect the market rates according to ERCOT's protocols at the time—the PUCT's absence has no bearing whatsoever on the adequacy of that relief.

And *fourth*, the Trustee "would have [no] adequate remedy" if her claim was "dismissed for nonjoinder." Fed. R. Civ. P. 19(b)(4). ERCOT has filed a proof of claim in *this* bankruptcy proceeding—ultimately, the Trustee's only recourse to oppose that proof of claim is through the bankruptcy court.

In all, "equity and good conscience" support the bankruptcy court's decision to move the proceeding forward rather than dismiss it. Fed. R. Civ. P. 19(b).

## IV.  SOVEREIGN IMMUNITY DOES NOT BAR ANY OF THE TRUSTEE'S CLAIMS.

ERCOT next takes issue with the bankruptcy court's decision denying its motion to dismiss on the basis of sovereign immunity. S*ee* Br. 51-55. This Court "review[s] *de novo* a district court's [denial] of a Rule 12(b)(1) motion to dismiss for

lack of subject matter jurisdiction because of state sovereign immunity." *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 240 (5th Cir. 2005).

Here, ERCOT is disentitled to sovereign immunity on two independent grounds: *First*, ERCOT—a private nonprofit corporation—is not an arm of the state protected by sovereign immunity in the first place. *Second*, ERCOT has plainly waived whatever immunity it might have had by affirmatively invoking the bankruptcy court's jurisdiction, seeking to recover nearly $300 million.

### A.    ERCOT is not an "arm of the state" entitled to sovereign immunity.

ERCOT is, in its own words, "a membership-based 501(c)(4) nonprofit corporation" that is "regulated by" the PUCT and the Texas Legislature. ERCOT, *Fact Sheet*, https://perma.cc/WJR3-Z4KM. ERCOT nevertheless argues that it is an "arm of the state" protected by sovereign immunity. Br. 51. But a Texas appellate court has already rejected this very argument, holding that ERCOT's funding, structure, and operations belie any such notion. *Panda Power Generation Infrastructure Fund, LLC v. ERCOT*, 641 S.W.3d 893, 907-912 (Tex. App.—Dallas 2022, pet. pending) (rejecting ERCOT's sovereign-immunity defense).

Eleventh Amendment immunity "encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities" where "the state is the real, substantial party in interest" because "the action is in essence one for the recovery of money from the state." *Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997). In determining whether

an entity should be treated as "an arm of the State" entitled to sovereign immunity, this Court looks to a number of factors:

> (1) whether state statutes and case law characterize the agency as an arm of the state;
>
> (2) the source of funds for the entity;
>
> (3) the degree of local autonomy the entity enjoys;
>
> (4) whether the entity is concerned primarily with local, as opposed to statewide problems;
>
> (5) whether the entity has authority to sue and be sued in its own name; and
>
> (6) whether the entity has the right to hold and use property.

*Bonin*, 65 F.4th at 254.

Of these, "[t]he most significant factor . . . is whether a judgment against [the entity] will be paid with state funds." *Bonin*, 65 F.4th at 254; *see also McDonald v. Bd. of Miss. Levee Com'rs*, 832 F.2d 901, 907 (5th Cir. 1987) ("[B]ecause an important goal of the eleventh amendment is the protection of states' treasuries, the most significant factor in assessing an entity's status is whether a judgment against it will be paid with state funds."); *Jacintoport Corp. v. Greater Baton Rouge Port Com'n*, 762 F.2d 435, 441 (5th Cir. 1985) ("[T]he most important factor in assessing an entity's eligibility under the Eleventh Amendment is 'whether the funds to defray any award would be derived from the state treasury.'"). As applied to ERCOT, these factors lead ineluctably to the conclusion that ERCOT is not an "arm of the state."

### 1. ERCOT is not funded by the state treasury.

Starting with the "most important" and, "in practice, . . . dispositive," factor (*Hess v. Port-Auth. Trans-Hudson Corp.*, 513 U.S. 30, 49 (1994)), ERCOT's source of funds weighs heavily against finding it an "arm of the state." Courts evaluating this factor "conduct inquiries into, first and most importantly, the state's liability in the event there is a judgment against the defendant, and second, the state's liability for the defendant's general debts and obligations." *Bonin*, 65 F.4th at 256. The answer to both inquiries here is that the State has no liability.

Nothing in Texas's statutes obligates the state to indemnify ERCOT or assume its debts. *See Vogt v. Bd. of Com'rs of Orleans Levee Dist.*, 294 F.3d 684, 693 (5th Cir. 2002) ("The state's liability for a judgment is often measurable by a state's statutes regarding indemnification and assumption of debts."). Nor will the state indirectly fund a judgment against ERCOT. Texas law does not authorize state treasury funds to be allocated to ERCOT or obligate the state to assume its debts and obligations. *Compare Daniel v. Univ. of Tex. Sw. Med. Ctr.*, 960 F.3d 253, 258 (5th Cir. 2020) (noting that UTSMC received state funding). Accordingly, the state neither "is responsible for general debts and obligations [nor] provides the lion's share of [ERCOT's] budget." *Vogt*, 294 F.3d at 693; *see also Jacintoport*, 762 F.2d at 441 ("The common factor is the extent of the state's liability for the entity's general debts and obligations.").

Instead, ERCOT maintains its own budget, which is funded by administration fees charged to wholesale buyers and sellers of electricity as well as user fees set and

imposed by ERCOT. Tex. Util. Code § 39.151(d-1),(e); 16 Tex. Admin. Code § 25.363(e), (g). ERCOT thus resembles in all material respects the Sabine River Authority, State of Louisiana (SRA-L), which establishes its own operating budget subject to review and approval by a state legislative committee, and operates from "self-generated revenues." *Bonin*, 65 F.4th at 257. As it determined with respect to the SRA-L, this Court "cannot conclude . . . that the state would be liable for a money judgment levied against" ERCOT. *Id.*

Indeed, ERCOT makes no attempt to claim that Texas would bear liability in the event of a judgment against ERCOT—the dispositive doctrinal issue. Instead, ERCOT devotes three sentences to asserting that the "State of Texas funds ERCOT" by a "State-created, PUCT-set regulatory fee collected using state power from the entities ERCOT regulates." Br. 52.

But that is not the relevant question: "Because one of the goals of the Eleventh Amendment is to protect state treasuries" (*Bonin*, 65 F.4th at 256), what matters for sovereign immunity purposes is whether a judgment against ERCOT would be paid, either directly or indirectly, out of the State's coffers (*id.* at 256-257)—not simply whether ERCOT's revenue sources are authorized by state law. And ERCOT offers nothing to suggest that the "state treasur[y]" would be impacted whatsoever by a judgment against it. *Id.* at 256.

In sum, as ERCOT itself has explained in judicial filings, "ERCOT is not funded in any part by state or local tax funds. ERCOT's funding is rather more akin to that of private electric utilities whose revenues are determined by rates set by the

PUC." Br. at 24, *HWY 3 MHP, LLC v. ERCOT*, No. 03-14-00303-CV (Ct. App. 3d Dist.—Austin July 30, 2014) ("*HWY 3* Br."). ERCOT thus has not established that a judgment against it would have any impact on the state fisc, and absent any such impact, "[t]he purpose of the immunity . . . largely disappears." *Jacintoport*, 762 F.2d at 440.

      2.    *State statutes and case law characterize ERCOT as independ-ent from the state.*

The next factor—whether state statutes and case law characterize ERCOT as an arm of the state—similarly weighs against immunity.

Nothing in the Public Utility Regulatory Act ("PURA") suggests that ERCOT is an arm of the state. To the contrary, under PURA, ERCOT is an "independent organization," defined as an "independent system operator or other person that is sufficiently independent of any producer or seller of electricity that its decisions will not be unduly influenced by any producer or seller." Tex. Util. Code. § 39.151(a)-(b); *see HWY 3 MHP, LLC v. ERCOT*, 462 S.W.3d 204, 209 (Tex. Ct. App.—Austin 2015) ("[T]he legislature's decision to designate an entity like ERCOT as an 'inde-pendent organization' rather than as an agency or by a similar title is some support for the idea that the legislature did not intend for ERCOT to be a governmental

unit.").[9] And ERCOT itself has conceded in judicial filings that "PURA evinces no legislative intention to treat ERCOT as a part of government." *HWY 3* Br. 25.

Texas Administrative Code provisions also undermine any argument that ERCOT is entitled to immunity. The Code provides that "ERCOT shall not be liable in damages for any act or event that is beyond its control and which could not be reasonably anticipated and prevented through the use of reasonable measures . . . ." 16 Tex. Admin. Code § 25.361(c). It further provides that, although ERCOT is not liable for its ordinary negligence when it exercises its power to interrupt transmission service to maintain system stability and safety, it may be liable for "its gross negligence or intentional misconduct when legally due." 16 Tex. Admin. Code § 25.200(d). Similarly, any actions by the PUCT in response to ERCOT's failure to comply with PURA or a PUCT order does not "preclude any form of civil relief that may be available under federal or state law." 16 Tex. Admin. Code § 25.362(j).

These provisions—which provide narrow limitations on liability but preserve and presuppose that liability is available in the first place—would be wholly superfluous if ERCOT were actually entirely immune from suit as an arm of the state. *See,*

---

[9] This case held that ERCOT is not a "governmental unit" for purposes of a Texas statute governing interlocutory appeals. *HWY 3*, 462 S.W.3d at 212. Another Texas court later reached the opposition conclusion—*see ERCOT v. CPS Energy*, 648 S.W.3d 520, 530-31 (Tex. App.—San Antonio 2021)—but it did so under a "broader application" of the statute that considered only whether ERCOT "operates as part of a larger governmental system" (*id.* at 531)—a much lower hurdle than the arm-of-the-state doctrine imposes.

*e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (canon against surplusage "is a cardinal principle of statutory construction.").

ERCOT is conveniently silent on PURA's and the Administrative Code's characterization of it. Instead, it looks to a *different* statute—the Sunset Act—and asserts that ERCOT is a "state agency" for purposes of that statute. BR at 51. But this argument proves too much. For example, the list of entities considered "state agencies" under the Sunset Act includes the Sabine River Authority, the Louisiana counterpart of which this Court held just over a month ago was *not* an arm of the state entitled to immunity. *See Bonin*, 65 F.4th 249. It also includes the Boll Weevil Eradication Foundation, which the Texas Supreme Court has held is a private, as opposed to public, entity for purposes of applying the nondelegation doctrine. *Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 471 (Tex. 1997). The list also includes entities such as the Angelina and Neches River Authority, Bandera County River Authority and Groundwater District, Brazos River Authority, the Lone Star Rail District, and other entities, which are equally unlikely to be considered arms of the state. *See* Tex. Sunset Advisory Comm'n, *Agencies Subject to Sunset Review*, https://www.sunset.texas.gov/reviews-and-reports/agencies.

Lacking any state statutes describing ERCOT as an arm of the state, ERCOT points to statutory provisions relating to state oversight and regulation of its operations. Br. 51-52. But none of these provisions say anything about whether ERCOT is the alter ego of the State. At most, they go to the degree of autonomy ERCOT has, which, as discussed below, also weighs against finding ERCOT an arm of the state.

### 3. ERCOT has significant autonomy.

ERCOT's degree of autonomy, while "less important than financial independence" and the characterization of the entity under state law (*Jacintoport*, 762 F.2d at 442), also counsels against immunity.

ERCOT has significant independent management authority. ERCOT, as an ISO, is statutorily tasked with ensuring transmission and distribution systems for all buyers and sellers of electricity, ensuring the reliability and adequacy of the regional electrical network, and other related responsibilities. Tex. Util. Code § 39.151(a). The method of performing these tasks is "wholly within ERCOT's discretion," and "ERCOT charts its own course, decides which actions to take, and how to operate its organization." *Panda Power*, 641 S.W.3d at 908.

ERCOT nevertheless claims that it lacks autonomy because its board is selected by a committee whose members are selected by the governor, lieutenant governor, and speaker of the house. Br. 52-53. But while the *selection committee* members are appointed by government actors (Tex Util. Code § 39.1513(a)), ERCOT's board itself is not (*id.* § 39.151(g)), and it is a leap too far to conclude that this indirect connection subjects ERCOT's board to the governor's control. *Cf. Free Enter. Fund v. PCAOB*, 561 U.S. 477, 497 (2010) (agency structure that "shelter[ed] the bureaucracy behind two layers of good-cause tenure" placed officers beyond President's control, violating Article II). This is particularly true given that ERCOT's board's members do not serve at the governor's pleasure. *Compare Jacintoport*, 762 F.2d at 442 ("It is true that the vulnerability of the commissioners to the governor's

pleasure militates against a finding of local autonomy."). And the selection committee's discretion is limited by qualifications for board members proscribed by the Utilities Code. *See* Tex. Util. Code § 39.151(g), (g-1)-(g-6).

These characteristics render ERCOT's board akin to commissions this Court has found autonomous in other cases. *Compare, e.g.*, *Pendergrass v. Greater New Orleans Expressway Comm'n*, 144 F.3d 342, 347 (5th Cir. 1998) ("parish appointments, fixed terms of appointments, local legislative delegation nomination, and senate approval" outweighed governor's role in appointment of commissioner), *and Vogt*, 294 F.3d 684 (although governor appointed six of eight commissioners, governor's discretion was limited by residence requirements and need for recommendations by local legislators), *with Bonin*, 65 F.4th at 257-258 (fact that "the entire board is appointed by and serves at the pleasure of the governor" weighed in favor of immunity—but was overcome by other factors, particularly the source of the entity's funds (*see* page 45, *supra*)).

ERCOT also argues that it is subject to the PUCT's "plenary control" because the PUCT must approve any rules adopted by ERCOT under the PUCT's delegated authority, its bylaws, and its process for adopting or revising protocols. Br. 53 (citing Tex. Util. Code §§ 39.151(d), (g-1), (g-6)). None of this affects ERCOT's independence in its day-to-day operations and management of its business. *See Panda Power*, 641 S.W.3d at 908 ("While ERCOT may be confined by the PUC's influence, neither the PUC nor the Legislature controls ERCOT's day-to-day operations. Even in matters where the PUC has oversight authority, ERCOT, like other private

organizations, is primarily operated by its CEO and board."). What is more, the fact that ERCOT does not have the "quintessential sovereign power" to make binding law by itself underscores that it is not an "arm of the state." *Id.* at 909.

### 4. The remaining factors weigh against immunity.

The remaining factors "weigh significantly less in the balance of equities," but nevertheless reinforce that ERCOT is not an arm of the state. *Bonin*, 65 F.4th at 254 (quotation marks omitted).

First, ERCOT concedes that it "may sue and be sued in its own name." Br. 54; *see also* Tex. Bus. Org. Code § 2.101(1).

Second, ERCOT, a 501(c)(4) nonprofit corporation, has the right to hold and use property. Tex. Bus. Org. Code § 2.101(3)-(4). Nothing in PURA or any other statute withdraws that power or requires title of property to vest in the name of the State of Texas. *Compare Jacintoport*, 762 F.2d at 443 (statute provided that "title to all property and improvements thereon operated by the Commission shall vest in the State of Louisiana"). While ERCOT asserts that its assets are functionally those of the state (Br. 53), none of the provisions it cites bears on ERCOT's right to hold and use property. *See* Tex. Util. Code §§ 38.202(d) (ISO must provide staff as necessary to assist the PUCT), 39.1515(a) (ISO must contract with entity selected by the PUCT to act as wholesale electric market monitor), 39.1516 (ISO must contract with an entity selected by the PUCT to act as cybersecurity monitor), 39.917 (establishing Texas Electric Grid Security Council), 39.151(d) (providing for transfer of

independent organization's assets to successor organization if independent organization is decertified).

Finally, while ERCOT does have a statewide focus, that is of little relevance. *See Bonin* 65 F.4th at 254. That factor is targeted at determining whether a unit of government "belongs to state or local government" (*Providence Behavioral Health v. Grant Road Public Utility Dist.*, 902 F.3d 448, 456 (5th Cir. 2018)), while this case asks the different question whether ERCOT, a private entity, is an arm of the state government. The balance of equities weighs overwhelmingly against such a conclusion.

### B.    Even if ERCOT were entitled to sovereign immunity, it has waived it.

Even if ERCOT were otherwise entitled to immunity, it has plainly waived that immunity by voluntarily invoking the authority of the bankruptcy court. Under the Bankruptcy Code, "[a] governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose." 11 U.S.C. § 106(b).

Here, there is no dispute that ERCOT has filed a proof of claim. ERCOT boldly asserts, however, that the Trustee's gross negligence claim does not arise out of the same transaction or occurrence as ERCOT's proof of claim. Br. 55. This assertion cannot be taken seriously.

The Court has explained that Section 106(b)'s "same transaction or occurrence" test is the same test used for compulsory counterclaims under Fed. R. Civ. P. 13(a). *In re Supreme Beef Processors, Inc.*, 468 F.3d 248, 254-56 (5th Cir. 2006). That test is a "loose standard which permits a broad realistic interpretation in the interest of avoiding a multiplicity of suits" and is satisfied when there is "any logical relation" between the claim and the counterclaim. *Plant v. Blazer Fin. Servs., Inc. of Ga.*, 598 F.2d 1357, 1360-61 (5th Cir. 1979). "A logical relationship exists when the counterclaim arises from the same aggregate of operative facts in that the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights, otherwise dormant, in the defendant." *Nat'l Liability & Fire Ins. Co. v. R&R Marine, Inc.*, 756 F.3d 825, 835 (5th Cir. 2014) (quotation marks and brackets omitted).

The Trustee's gross negligence claim easily satisfies this standard. Both the gross negligence claim and ERCOT's proofs of claim arise out of ERCOT's actions leading up to and during Winter Storm Uri that led to improperly high costs to market participants. Those actions are precisely what the Trustee alleges were grossly negligent. ROA.307-308. And those actions are what led to the charges ERCOT now seeks to recover in its proofs of claim. Because the Trustee's gross negligence claim and ERCOT's proofs of claim share this set of operative facts, ERCOT has plainly waived any sovereign immunity it might have with respect to the gross negligence claim. *Cf. In re Lazar*, 237 F.3d 967, 980 (9th Cir. 2001) (Board of Equalization's proofs of claims against debtors' estate for underground-storage-tank fees arose out

of same transaction or occurrence as Trustee's claims for reimbursement for corrective actions taken on underground storage tanks).

## V.  THE TRUSTEE'S NEGLIGENCE CLAIM IS PROPER.

ERCOT also argues that the Trustee failed to plead a cognizable legal duty sufficient to state a gross negligence claim. Br. 49. But the bankruptcy court correctly held—for the second time—that the Trustee plausibly alleged a duty owed by ERCOT to Entrust. This determination is subject to de novo review. *Mitchell v. State Farm Fire & Cas. Co.*, 954 F.3d 700, 707 (5th Cir. 2020).

The Trustee's complaint alleges that ERCOT "knew of the extreme degree of risk that a weather event such as Winter Storm Uri would cause to the Texas Interconnection and Texas customers," and also knew that "an extreme weather event such as Winter Storm Uri was highly likely during the winter of 2020-2021." ROA.307-308; *see also* ROA.288-294. Furthermore, ERCOT "knew that most of the Texas Interconnection's generation and transmission capacity was inadequately prepared for extreme winter weather," "knew that Texas customers depend on electric power to generate heat," and "knew that a weather event such as Winter Storm Uri could cause low generation supply and extremely high demand, and thus cause rolling blackouts, loss of heat, and an extreme degree of risk to the health and safety of Texans." ROA.307.

Because it was foreseeable—and in fact foreseen—by ERCOT that there was a severe risk of an extreme weather event that would cause substantial injury to the health and safety of Texans as well as to Load Servicing Entities like Debtors within

the ERCOT marketplace, ERCOT had a legal duty to ensure the reliability and adequacy of the Texas Interconnection. *See Tex. Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 36 (Tex. 2002) (describing "foreseeability as the foremost and dominant consideration in the duty analysis") (quotation marks omitted).

ERCOT has not even attempted to argue that the burden on ERCOT of remedying vulnerabilities in the electrical network and of notifying customers of changes to pricing would counterbalance the recognition of such a duty. *See Edward D. Jones & Co. v. Fletcher*, 975 SW.2d 539, 544 (Tex. 1998) ("In determining whether a tort duty should be recognized, [courts] consider several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant."). Nor could it, as the legislature and the PUCT have already determined that ERCOT should have the burden of such a duty. *See* Tex. Util. Code § 39.151(a)(2); 16 Tex. Admin. Code § 25.361(b).

ERCOT argues instead that courts may not "hold people to very general duties of exercising ordinary care in all circumstances" and that the Supreme Court of Texas "cautions against creating new common law duties when a comprehensive regulatory scheme exists." Br. 50 (first quoting, and then citing, *Elephant Ins. Co., LLC v. Kenyon*, 644 S.W.3d 137, 145, 152 (2022)). But as explained above, the Trustee seeks only to hold ERCOT to the duty of exercising care where there was a foreseeable and extreme risk of serious harm—as the Texas Supreme Court in

*Elephant Insurance* recognized was appropriate. *See* 644 S.W.3d at 149. And nothing in *Elephant Insurance* suggests that the existence of a regulatory scheme negates a common law duty—to the contrary, Texas law explicitly recognizes tort duties based on "a standard of conduct" defined in a regulatory statute. *See Praesel v. Johnson*, 967 S.W.2d 391, 394-396 (Tex. 1998).

Thus, the statutes and regulations governing Texas's public utilities further support the conclusion that ERCOT had a duty to ensure the reliability and adequacy of the Texas Interconnection. Section 39.151(a)(2) of the Texas Utilities Code requires that ERCOT "ensure the reliability and adequacy of the regional electrical network." The Administrative Code does the same. 16 Tex. Admin. Code § 25.361(b). These provisions in and of themselves clearly define a standard of conduct, and thus independently give rise to a duty in tort. *Praesel*, 967 S.W.2d at 394-396.

ERCOT argues that these provisions cannot support the Trustee's claim because they do not create any private cause of action. Br. 50. But that is beside the point: the *common law* supplies the cause of action—gross negligence—and the code provisions simply identify and define the duty element. And while ERCOT is correct that "a duty imposed by statute" is not necessarily "equivalent to a duty in tort" (Br. 50-51), where, as here, the statute clearly defines the standard of conduct; the injury at issue grew out of a breach of that standard; the statute is designed to protect the class of persons to which the injured party (here, debtors) belong; and the conduct would be considered substandard even in the absence of the statute, the

statute may supply the standard of conduct for tort liability. *See Praesel*, 967 S.W.2d at 395.[10] The Trustee has sufficiently pleaded the existence of a duty.

## VI. THE BANKRUPTCY COURT ERRED IN DISMISSING THE TAKINGS CLAIM.

The Trustee also brought a takings claim, asserting that ERCOT's mass transition of valuable customer contracts away from ERCOT constituted an uncompensated taking in violation of the Fifth and Fourteenth Amendments. *See* pages 11-12, *supra*. As the Trustee explained in detail below, each of the elements of a takings claim is met here: ERCOT was (1) "acting in [a] sovereign capacity" (*Preston Hollow Cap., L.L.C. v. Cottonwood Dev. Corp.*, 23 F.4th 550, 554 (5th Cir. 2022)); (2) appropriated Entrust's private property interests in its valuable customer contracts (*Degan v. Bd. of Trustees of Dallas Police & Fire Pension Sys.*, 956 F.3d 813, 815 (5th Cir. 2020)); and (3) failed to provide "full compensation"—or any compensation at all (*Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2170 (2019)).

The bankruptcy court's entire stated reasoning for dismissing the takings claim was that "it forces the Trustee to take positions that I think are inconsistent with respect to other claims also other findings that I have made." ROA.644. As the

---

[10]   *Entex, A Division of Noram Energy Corp. v. Gonzalez*, 94 S.W.3d 1, 9-10 (Tex. App.—Houston [14th Dist.] 2002, pet. denied), is not to the contrary. There, while defendant had the *right* under regulation to take an action the plaintiffs later claimed it should have taken, it was not *required* by statute or regulation to do so. *See id.* Here, by contrast, the relevant statutes and regulations require ERCOT to do precisely what the Trustee alleges ERCOT did not: ensure the reliability and adequacy of the Texas Interconnection.

court explained earlier in the hearing, this is a reference to the requirement of state action: The court identified "a problem" with the takings claim, because "I have said many times before that ERCOT's not the State of Texas. I've said that a number of times, and I believe that based upon what I've heard in multiple cases. In order to proceed on your takings claim, aren't you now saying that, in fact, ERCOT is the government?" ROA.617-18.

This dismissal for failure to state a claim is reviewed de novo. *E.g.*, *Stratta*, 961 F.3d a 349.

**1.** First, to the extent the court dismissed the takings claim simply because "it forces the Trustee to take positions that I think are inconsistent with respect to other claims" (ROA.644), that was black-letter legal error. "[U]nder Rule 8(e), . . . [a plaintiff] may state as many claims as it has, regardless of their consistency." *Fredonia*, 481 F.2d at 790 (5th Cir. 1973); *accord, e.g.*, Charles Alan Wright et al., 5 *Federal Practice & Procedure* § 1283 (4th ed.). A plaintiff cannot ultimately *recover* on multiple inconsistent theories (*Fredonia*, 481 F.2d at 801), but consistency of legal theories is not a requirement to survive a motion to dismiss.

**2.** In any event, the Trustee's two legal theories—that ERCOT lacks sovereign immunity because is not an arm of the state, and that its actions constitute state action for Takings Clause purposes—are *not* legally inconsistent. The respective doctrinal tests under these two inquiries are meaningfully different, and the Trustee has plausibly pleaded that ERCOT satisfies one, but not the other.

As the Supreme Court has explained, "when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." *Evans v. Newton*, 382 U.S. 296, 299 (1966). Thus, constitutional claims may be brought against private entities under Section 1983—as the Trustee has done here—so long as "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad.*, 531 U.S. at 295 (quotation marks omitted); *see, e.g.*, *Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 186-187 (2d Cir. 2005) (applying the *Brentwood* state-action analysis to a takings claim).

One way this "close nexus" can be demonstrated is where the private actor exercises a delegated public function: "We have treated a nominally private entity as a state actor . . . when it has been delegated a public function by the State." *Brentwood*, 531 U.S. at 296 (collecting cases). A "'public function' is one that is usually reserved for the state" such as "eminent domain, elections, parks, and the like." *Roberts v. Cameron-Brown Co.*, 556 F.2d 356, 358 (5th Cir. 1977); *see also, e.g.*, *Rosborough v. Mgmt. & Training Corp.*, 350 F.3d 459, 461 (5th Cir. 2003) (incarceration of criminals).

Utilities regulation falls comfortably in the same category. Indeed, "the regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States." *Arkansas Elec. Co-op. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983); *see also U.S. Fid. & Guar. Co. v. Quinn*

*Bros. of Jackson*, *Inc.*, 384 F.2d 241, 245 (5th Cir. 1967) ("the protection for the consuming public . . . inheres in the nature of a public utility"); *Boman v. Birmingham Transit Co.*, 280 F.2d 531, 535 (5th Cir. 1960) (describing public utility services as having a "special franchise of using state property for private gain to perform a public function").

The specific action taken by ERCOT here—effecting a mass transition of Entrust's retail energy customers to a provider of last resort ostensibly in order to prevent an interruption of service—is no exception; indeed, the relevant statutes and regulations explicitly state the public-protective purpose of such an action. 16 Tex. Admin. Code § 25.43(a) (the "[p]urpose" of the section is to "ensure [the] availab[ility]" of provider-of-last-resort service to "any retail customer who is transferred . . . because the customer's [provider] failed to provide service . . . or failed to meet its obligations."); Tex. Util. Code. § 39.101(b)(4).

Thus, when ERCOT conducted a mass transition of Entrust's customers, it was exercising the "delegated public function" of utilities regulation (*Brentwood*, 531 U.S. at 296), and the state-action requirement is therefore satisfied for purposes of the takings claim. Nothing about that legal theory is "inconsistent" (ROA.644) with the separate conclusion, under a completely different doctrinal framework, that ERCOT is not an arm of the state for sovereign immunity purposes—largely because a money judgment against it would not risk funds from state coffers. *See* pages 42-52, *supra*. The bankruptcy court therefore erred in dismissing the takings claim on this basis.

**CONCLUSION**

The judgment of the bankruptcy court should be reversed as to the Trustee's takings claim and affirmed in all other respects.

Dated:   June 2, 2023

Respectfully submitted,

*/s/ Debbie E. Green*

Charles R. Gibbs
Debbie E. Green
MCDERMOTT WILL & EMERY LLP
2501 North Harwood Street
Suite 1900
Dallas, Texas 75201-1664
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
crgibbs@mwe.com
dgreen@mwe.com

—and—

Darren Azman
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
dazman@mwe.com

*Counsel for Appellee-Cross-Appellant*
*Anna Phillips, as Liquidating Trustee of the*
*Entrust Liquidating Trust*

## CERTIFICATE OF SERVICE

I certify that that on June 2, 2023, I caused the foregoing brief to be served electronically on all parties via the Court's CM/ECF system.

Dated: June 2, 2023

*/s/ Debbie E. Green*
Debbie E. Green

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned counsel for Plaintiff-Appellants certifies that this brief:

(i)      complies with the type-volume limitation of Rule 28.1(e)(2)(B)(i) because it contains 15,286 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii)      complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 365 and is set in size 14 Times New Roman font.


Dated: June 2, 2023                         */s/ Debbie E. Green*_____
                                            Debbie E. Green